**COMTROL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–335 C.**

United States Court of Federal Claims.

April 30, 2001.

Jack L. Schoenhals, Salt Lake City, UT, for plaintiff. Richard J. Webber, Washington, DC, of counsel.

Kent G. Huntington, with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Kathryn A. Bleecker, Assistant Director, Civil Division, Department of Justice, Washington, DC, for defendants. Karen D. Huber, Federal Aviation Administration, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This contract dispute comes before the court on cross motions for partial summary judgment and defendant's motion to dismiss in part. Plaintiff, Comtrol, Inc. (Comtrol) seeks equitable adjustments and/or damages to cover costs incurred in excess of the contract price for constructing an air traffic control tower (ATCT) for defendant, the Federal Aviation Administration (FAA), at the Salt Lake City International Airport. Complaint (Compl.) ¶ 1. The FAA's contracting officer issued final decisions on Comtrol's claims on May 27, 1998 and October 15, 1998, granting partial relief. *Id.* Plaintiff appeals those decisions and requests full payment of its claims. *Id.*

This opinion addresses dispositive motions on three counts of a five count complaint.[1] In each of the three counts, Comtrol claims that the site conditions it encountered differed materially from the conditions indicated in the FAA's Solicitation DTFA11–95–B–00108 (Solicitation), entitling Comtrol to damages for extra work and constructive acceleration of the contract. Compl. at ¶¶ 47–58. In opposition, defendant has filed its Motion to Dismiss Counts III and IV of the Complaint and Opposition to Plaintiff's Motion for Partial Summary Judgment and Cross Motion Upon Counts I and II of the Complaint (Def.'s MTD). For the following reasons, plaintiff's motion for partial summary judgment on Count II, for differing site conditions, is DENIED and defendant's cross-motion for summary judgment is GRANTED. Plaintiff's motion for partial summary judgment on Count I, for defective specifications, is DENIED and defendant's cross-motion for summary judgment on Count I is GRANTED. Plaintiff's motion for partial summary judgment on Count III for breach of contract and defendant's motion to dismiss Count III are both DENIED. The court considers, sua sponte, summary judgment for defendant on Count III. Summary Judgment on Count III is GRANTED for defendant.

## I. Background

In 1994, the FAA invited bids to construct an ATCT at the Salt Lake City International Airport. Defendant's Proposed Findings of Uncontroverted Fact (Def.'s PFUF) at ¶ 1.[2] This dispute is about what site conditions the Solicitation indicated. In its Solicitation, the FAA indicated that bidders should base their bids on certain information about the site, as follows:

Base bids on the following criteria:

a. Surface elevations are as indicated

b. No pipes or other manmade obstructions, except those indicated, will be encountered.

c. The character of the material to be excavated or used for subgrade is as indicated. Hard material in the form of conglomerate clay, sand, silt or gravel may be encountered. Remove such hard material to the lines and grades indicated regardless of the hardness.

d. Ground water elevations indicated in the geotechnical investigation report are those existing at the time subsurface investigations were made and do not necessarily represent ground water elevation at the time of construction.

Solicitation Section 02221, ¶ 1.6.[3] Within this same section, the Solicitation provides a list of information sources for the proposed construction site under the heading "Project Specific Information." Solicitation Section 02221, ¶ 1.1.5. This list included:

RB & G Engineering Inc., Geotechnical Investigations for Airport Traffic Control Tower, August 1993.

Salt Lake City Airport Authority, Engineering and Maintenance, Construction Drawings for 1200 North Widening and Landscaping, April 1988.

Salt Lake City Airport Authority, Engineering and Maintenance, Construction Drawings for ATCT & Morris Site Preparation, August 1993.

HNTB Corporation, Construction Drawings for Airport Traffic Control Tower Site Fill, December 1993.

1. The parties filed a joint stipulation of dismissal with prejudice as to Counts IV and V on April 12, 2001.

2. Facts cited to the filings of only one party are not contested by the other party.

3. The Solicitation and certain drawings (Drawings) incorporated by reference in the Solicitation, together with certain other significant documents, were filed with this court on November 22, 1999. The Contract with Modifications, the Solicitation Documents with Amendments, the Contracting Officer Final Decisions, and the Claim Letters to Which the Final Decisions Responded, Submitted Pursuant to the Court's October 29, 1999 Order, Volumes I and II. The parties agreed that the court could rely on these documents in deciding the pending motions. Transcript of Oral Argument on January 9, 2001 (Trans.) at 15–16. References in this opinion to the Solicitation and not to a party's filings are to the November 22, 1999 filing.

HNTB Corporation, Construction Drawings for Combined East and West Airfield Vault Project.

Solicitation Section 02221, ¶ 1.1.5.[4]

The first dispute is about the subsurface soil and water conditions to be encountered during excavation. Paragraph 1.6 of Solicitation Section 02221 specifies that "[h]ard material ... may be encountered." ¶ 1.6. The Solicitation elsewhere defines "[h]ard [m]aterial" as "[w]eathered rock, dense consolidated deposits or conglomerate materials which are not included in the definition of 'rock' but which usually require the use of heavy excavation equipment with ripper teeth or the use of jack hammers for removal." Solicitation Section 02221, ¶ 1.3.11. A report listed under "Project Specific Information" in Solicitation Section 02221, ¶ 1.1.5, a 1993 soil study by RB & G Engineering Inc. (RB & G Report), describes the subsurface conditions at the construction site as "relatively soft gray clay" in the upper 6.5 to 10 feet, with the remainder "generally consist[ing] of interbedded sand and clay layer." RB & G Report at 2–3. The Report also reported groundwater at an approximate depth of seven feet for one test hole and two feet for the remaining test holes. Id. at 2–3. The RB & G Report observes as well that "all of the subsurface materials are natural deposits" and "no environmental factors appear ... which would adversely effect [sic] foundation performance." Id. at 2. The RB & G Report also notes that a few weeks before the study the entire southwesterly portion of the site had been covered in water and suggested that "the grading plan for the proposed facility should involve the placement of several feet of fill throughout the site." Id. at 1–2.[5] Though not distributed to bidders, the RB & G Report was incorporated by reference in the contracting materials and made available to potential bidders for review at the archi-tect's offices. Def.'s PFUF ¶¶ 15. Plaintiff made no request to review the RB & G Report prior to submitting its bid. Transcript of Oral Argument on January 9, 2001 (Trans.) at 29.

The second dispute involves two allegedly unknown manmade subsurface obstructions located in a utility corridor along the southern boundary of the site, closely adjacent to the ATCT. Paragraph 1.6 of Solicitation Section 02221 states, "No pipes or other manmade obstructions, except those indicated, will be encountered." ¶ 1.6. However, the construction site included a utility corridor with three concrete duct banks and a Chevron jet fuel pipeline. Pl.'s PFUF ¶¶ 13, 19 The concrete duct banks were installed in 1994, after the RB & G report was prepared, but before the FAA invited bids. Plaintiff's Proposed Findings of Uncontroverted Fact (Pl.'s PFUF) ¶ 13. Some half dozen of the drawings referenced in the Solicitation at Section 02221, ¶ 1.1.5, one of which is titled "Utility Plan," depict the utilities within these ducts. Drawings NMD–600–41798–C1.2, -C1.3, -C1.4, -C1.5 (Utility Plan), -E1.1. These drawings label the ducts as "RWL," "T," and "PWR," with symbols over the utilities labeled as "existing electrical manholes." Id. The Solicitation also includes specific provisions for "[p]rotection of existing utilities and cables." Solicitation Section 01011, ¶ 13.1.

The Chevron pipeline, like the concrete duct banks, was installed after preparation of the RB & G Report, but before the FAA invited bids. Pl.'s PFUF at ¶ 19. According to plaintiff, the contract materials did not disclose the existence of the pipeline. Id. However, one site preparation drawing listed in Solicitation Section 02221, ¶ 1.1.5 does depict the location of a former Chevron pipeline with the label, "Existing Chevron Pipeline

---

4. In an October 28, 1999 status conference, the parties stipulated that the Solicitation document affirmatively indicated the subsurface conditions and incorporated by reference the RB & G Geotechnical Report, listed in ¶ 1.1.5 of Section 02221. Both as a necessary corollary to the foregoing agreement, and in accordance with settled principles of contract interpretation, the court finds that the Solicitation also incorporated by reference all drawings listed in ¶ 1.1.5. See

*Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1270–71 (Fed.Cir.2001).

5. It is not possible from the RB & G Report to determine the dimensions of the "southwesterly portion" covered in water, or whether the area include the ATCT site. The ATCT is, however, located along the southerly edge of the construction site. See Drawings *passim*.

(To be Relocated to New Utility Corridor by Others)." ATCT and Morris Site Preparation, ATCT Site Plan and Existing Conditions (Pipeline Drawing), Defendant's Appendix v. 1 at 173. None of the drawings listed in ¶ 1.1.5 depicts the location of the new pipeline.

Based on the words "hard material" and "no pipes or other manmade obstructions" in Solicitation Section 02221, ¶ 1.6, plaintiff prepared its bid on the assumption it would encounter hard material and no subsurface obstructions such as concrete duct banks or a jet fuel line. *See* Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (Pl.'s Mot.) at 8, 22–23, 25. The FAA awarded the contract to Comtrol on April 6, 1995. Compl. ¶ 4. Plaintiff began construction of the ATCT soon thereafter by inserting sheet piling around the excavation area "to shore the surrounding soil, and to act as a form for the concrete foundation pile cap." Pl.'s Mot. at 8. Shortly after beginning construction, Comtrol discovered the three concrete duct banks and Chevron pipeline. *Id.* These subsurface structures required various construction accommodations to prevent damage to the utilities. Pl.'s Mot. at 9.

During excavation, plaintiff also discovered that the soil at the site did not contain the hard material it had assumed it would find. Rather, the soil consisted of "Brown Clayey Gravel," "Gray Clay," "Gray Clay W/ Sand Layer," "Fine to Medium Sand," and "Gray to Black Clay W/ Sand Layers." Pl.'s PFUF ¶ 9. As it excavated within the sheet piling, Comtrol also encountered increasing quantities of water that required pumping to prevent submersion of the bottom of the excavation. *Id.* ¶ 23. As plaintiff continued to excavate, the ground outside the sheet piling cracked near one of the concrete duct banks, causing the piling to rotate inward—or "kick in"—at the top. *Id.* ¶ 29, 30. According to plaintiff, this was caused by "quick conditions," also known as quicksand, created when the high water table at the site exerted a high hydraulic water pressure on the surrounding soil. *Id.* ¶ 33. According to defendant, however, the sheet pile wall kicked in because Comtrol overexcavated around the sheet piling, rendering it inadequate to sup-

port the soil and ground water outside the excavation. Def.'s PFUF ¶ 46. To protect existing utilities and prevent further failure of the sheet piling, Comtrol immediately backfilled the excavation. *Id.* ¶ 44; Pl.'s PFUF ¶¶ 31–32.

In response to the inward rotation of the sheet piling, the FAA directed Comtrol to take a number of remedial actions, including conducting soil and hydrological studies, installing water wells to lower the water table outside the excavation, installing permanent underground supports for all three concrete duct banks, and uncovering the Chevron pipeline to prevent damage from soil vibrations. *See, e.g.,* Pl.'s PFUF ¶¶ 38, 51–52, 55, 82, 85–86. Comtrol submitted requests for equitable adjustment for these actions, in response to which the FAA offered $626,747 in additional compensation. *Id.* ¶¶ 122, 134–37. According to plaintiff, this contract modification fails to compensate it fully for the cost of the remedial actions. *Id.* ¶ 137. Comtrol filed its complaint with this court on May 24, 1999 seeking relief on five counts. Plaintiff now moves for partial summary judgment on portions of the first three counts of its complaint, seeking declarations that: 1) plaintiff encountered differing site conditions with regards to the softer soil and alleged quick conditions, the concrete duct banks, and the Chevron pipeline; 2) plaintiff is entitled to compensation for extra work not required by contract but necessitated by the conditions plaintiff encountered; and 3) defendant in bad faith refused to consider the merit of plaintiff's "quick conditions" and differing site conditions claims. Pl.'s Mot. at 30–31. Defendant cross-moves for summary judgment on Counts I and II of the complaint, relating to defective specifications and differing site conditions, and moves to dismiss count III, relating to breach of contract, for lack of subject matter jurisdiction. Def.'s MTD at 1.

## II. Discussion

### A. Motions to Stay Proceedings

Defendant moved to stay consideration, pending settlement efforts, of whether the presence of the Chevron pipeline is a differing site condition or defective specification.

Defendant's Motion to Stay Proceedings at 1. Defendant also sought to stay further proceedings with respect to the issue of whether it owes plaintiff further compensation relating to its accommodations of the Chevron pipeline. *Id.* Plaintiff responded to defendant's motion by moving to stay consideration of the parties' cross motions for summary judgment in their entirety to allow for more meaningful settlement discussions. Comtrol's Response to Defendant's Motion to Stay Proceedings and Comtrol's Motion to Stay Proceedings at 2. Since filing these motions, the parties have indicated to the court that their settlement discussions have been unsuccessful. Therefore the court denies both motions to stay as moot.

### B. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rules of the Court of Federal Claims (RCFC) 56(c); *Southfork Systems, Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). A fact is material when it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies its burden, the burden shifts to the nonmovant to show that there is a "genuine issue for trial" for each issue on which it would bear the burden at trial. *Id.*

█ Contract interpretation is a question of law appropriate for summary judgment. *Muniz v. United States,* 972 F.2d 1304, 1309 (Fed.Cir.1992); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916–17 (Fed.Cir.1984). In interpreting a contract, the court looks first to the contract's plain language. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). If the language is unambiguous, the court must accept its meaning. *Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1997).

### C. Differing Site Conditions

The focus of this case is whether Comtrol encountered "Type I" differing site conditions, entitling it to additional time to perform the contract and additional compensation under the contract for additional costs. *See* Solicitation Part II, Section I (incorporating by reference the Federal Acquisition Regulation (FAR) § 52.236). Comtrol's main allegations are that it encountered conditions materially different from those specified in the Solicitation as to the soil and water conditions, the three concrete duct banks, and the Chevron pipeline. Pl.'s Mot at 21–24.

Type I differing site conditions consist of "subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract." FAR § 52.236–2(a)(1). A court will examine the contract's indications "from the vantage point of what a reasonably prudent, knowledgeable and experienced contractor would have expected." *Hardwick Bros. Co. v. United States,* 36 Fed. Cl. 347, 406 (1996). If the conditions at the site differ materially and cause an increase or decrease in the contractor's costs or completion time, the contractor is entitled to an equitable adjustment. FAR § 52.236–2(b). To succeed on a Type I differing site claim, the plaintiff must prove all of the following elements:

(i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim;

(ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents;

(iii) the contractor must have reasonably relied on the indications of subsurface conditions in the contract;

(iv) the subsurface conditions actually encountered, within the contract site area, must have differed materially from the subsurface conditions indicated in the same contract area;

(v) the actual subsurface conditions encountered must have been reasonably unforeseeable; and

(vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.

*Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193, 218–19 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir.1988).

### 1. Soil and Water Conditions

Plaintiff argues that ¶ 1.6 of Solicitation Section 02221 directed bidders to base their bids on specific soil and water conditions, namely that the site consisted of hard material. Pl.'s Mot. at 22–23. The loose sand and water plaintiff encountered was not the dry, hard material plaintiff expected. According to plaintiff this difference constitutes a differing site condition. *Id.* at 23.

Defendant contends that the soil and water conditions plaintiff encountered were not materially different from those indicated in Solicitation Section 02221, ¶ 1.6 because the text of that paragraph did not definitively indicate that the site consisted of hard material. Def.'s MTD at 10–13. Defendant points to the language of ¶ 1.6 which specifies that "[h]ard material ... *may* be encountered." Solicitation Section 02221, ¶ 1.6 (emphasis added); Def.'s MTD at 12. Defendant interprets this language as a "warning to bidders" that their bids should take into account the possibility of encountering hard materials. Def.'s MTD at 12. To interpret this language as specifying that only hard materials would be encountered, defendant argues, would render the word "may" meaningless. *Id.* at 12–13.[6]

Paragraph 1.6 of Solicitation Section 02221 also refers to the soil being "as indicated," and to ground water elevations as being "indicated in the geotechnical investigation report." ¶ 1.6. The sole geotechnical report listed in Section 02221 is the RB & G Report. Solicitation Section 02221, ¶ 1.1.5. According to defendant, the description of the soil and water table elevation in the RB & G Report is consistent with what plaintiff encountered

at the site, and should have caused a reasonable contractor to anticipate the need for dewatering. Defendant's Reply to Plaintiff's Oppositions to Defendant's Motion to Dismiss Count III and Motion for Summary Judgment Upon Counts I and II at 11; Def.'s MTD at 26. Had plaintiff examined the RB & G Report or other documents incorporated by reference, defendant argues, plaintiff would have been aware of the soil conditions at the site. Def.'s MTD at 15–16, 19.

Plaintiff acknowledges that it did not examine the RB & G Report prior to bidding on the Solicitation, but asserts that even if it had, it would not have expected the conditions it encountered at the site. Trans. at 30–39. According to plaintiff, the RB & G Report describes soil that is relatively dense and self-supporting that would require no shoring or sheeting during excavation. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment as to Counts I and II of Plaintiff's Complaint and to Dismiss Count III of Plaintiff's Complaint and Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Pl.'s Resp.) at 22–23. Plaintiff contends that examining the report would not have caused it to act differently in its bidding or excavation. Trans. at 30–39.

To prove differing site conditions, Comtrol must first show that defendant's contract documents affirmatively indicated or represented the subsurface conditions. The court disagrees with plaintiff's assertion that ¶ 1.6 of Solicitation section 02221 expressly indicates the site consists of hard material. By specifying that "[h]ard material ... may be encountered," the Solicitation indicates only the possibility of encountering hard material. More importantly, ¶ 1.6 describes the soil and water conditions as being "as indicated." Solicitation Section 02221, ¶ 1.6. This language informs a prospective contractor that soil and water descriptions included elsewhere in the contract will take precedence over the hard material that "may"

---

6. The definition of hard material in Solicitation Section 02221, ¶ 1.3.11 as "materials ... which usually require the use of heavy excavation equipment with ripper teeth or the use of jack-

hammers" also refers to a common occurrence, not a warranty of the material plaintiff would encounter. Solicitation Section 02221, ¶ 1.3.11.

exist. Contract documents include not only the Solicitation, drawings, specifications, and other documents physically provided to potential bidders, but also materials referenced in the Solicitation documents. *See, e.g., Randa/Madison Joint Venture III v. Dahlberg,* 239 F.3d 1264, 1270–71 (Fed.Cir.2001); *A.S. McGaughan Co. v. United States,* 24 Cl.Ct. 659, 666 (1991) (contractor bound by indications of soil test results referenced in the contract), *aff'd,* 980 F.2d 744 (Fed.Cir.1992); *Felton Constr. Co.,* AGBCA 406–9, 81–1 BCA ¶ 14,932 at 73, 904, 1981 WL 6985 (soil survey referenced in plans and specifications was a contract document), *recons. denied,* 81–2 BCA ¶ 15,371, 1981 WL 9531. In this case defendant specifically listed the RB & G Report under the heading "Project Specific Information." Solicitation Section 02221, ¶ 1.1.5. The court notes that this information appeared not only within the same section, but just two pages prior to ¶ 1.6. The RB & G Report describes the soil and water conditions in great detail, and thus easily qualifies as an "indication" of the conditions. Contrary to plaintiff's assertions, the RB & G Report does not indicate hard materials, but rather "relatively soft gray clay" and an "interbedded sand and clay layer." RB & G Report at 2–3. Thus, notwithstanding that Solicitation Section 02221, ¶ 1.6 suggests the possibility of hard material, the soil conditions "as indicated" are softer and saturated with water.

By contrast, the section of the Solicitation relating to utilities states that "[t]he character of the material . . . is as indicated. Hard material . . . will be encountered." Solicitation Section 02225, ¶ 1.6. The statement that hard material "will be encountered" is more definite than the phrase "may be encountered" in ¶ 1.6 of Section 02221. However, the court notes that, just as in Section 02221, ¶ 1.6 of Section 02225 also states that the soil is "as indicated." As with Section 02221, the reference to "as indicated" in ¶ 1.6 of Section 02225 includes the indications contained in the RB & G Report. Since the RB & G Report indicates softer soil, the phrase "will be encountered" does not guarantee that even the portion of the site involving utilities consists solely of hard material. Even if the phrase "will be encountered" is in conflict

with the indications in the RB & G Report, the conflict is apparent, creating a duty to inquire, as discussed below. In any case, the contract documents, including Section 02221, ¶ 1.6, Section 02225, ¶ 1.6, and the RB & G Report, affirmatively indicate the site's subsurface conditions.

In support of its differing site conditions claim, plaintiff relies primarily on *H.B. Mac, Inc. v. United States,* 153 F.3d 1338 (Fed.Cir. 1998). In *H.B. Mac,* a contractor claimed differing site conditions after encountering unexpected subsurface water, requiring shoring. *Id.* at 1341–42. According to plaintiff, *H.B. Mac* held that "representations contained in a referenced soils report do not constitute contract representations." Pl.'s Resp. at 14. However, the court's reason for disregarding the soil reports in that case was not that they were merely referenced in the bidding materials. Rather, the soil reports were unreliable because they analyzed soil far from the construction site and were therefore inappropriate to support a reasonable contractor's reliance. *Id.* at 1347. Unlike the soil reports in *H.B. Mac,* the RB & G Report offer a comprehensive report of the soil conditions at the precise construction site, including express indications of the soil and water conditions based on RB & G's own geotechnical investigation. *See* RB & G Report. In this case the contract documents, which include the RB & G Report as well as the thumbnail descriptions contained, *inter alia,* in Solicitation Sections 02221 and 02225, affirmatively indicate the site's subsurface soil and water conditions.

Second, Comtrol must show that it reasonably interpreted defendant's contract materials. *Weeks,* 13 Cl.Ct. at 218. An interpretation is not reasonable if it is unsupported by the contract's indications or based on some contract indications to the exclusion of others. *See, e.g., B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 614 F.2d 748, 753 (1980) ("[C]ontract should be interpreted in a manner which gives meaning to all its parts."); *Metric Constructors, Inc. v. U.S.,* 44 Fed.Cl. 513, 520 (Fed.Cl.1999) ("Courts should read contract provisions to effectuate [the] spirit and purpose of the entire contract." (internal quotations omitted)); *Mey-*

ers Cos. v. United States, 41 Fed.Cl. 303, 310 (1998) (" 'Contracts and solicitations are to be read as a whole, so as to give meaning to all provisions.' " (quoting *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 144 (1997))). Here, plaintiff interpreted defendant's contract materials as indicating that the site would consist of hard material. While Solicitation Section 02221, ¶ 1.6 mentions hard material, it states only that it "may" exist. Assuming the pervasive existence of hard material from this statement is not reasonable. Moreover, plaintiff made this assumption based solely on ¶ 1.6, and not on the contract documents as a whole. Plaintiff has acknowledged that it did not obtain and review the RB & G Report, which is part of the contract documents. Def.'s PFUF ¶ 21. Plaintiff was nevertheless on constructive notice of all information in the RB & G Report by virtue of the Solicitation. *See Randa/Madison,* 239 F.3d at 1270–72 (holding that contract references to tests and samples put contractor on notice of that information, and the contractor can be presumed to have reviewed it); *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 312 F.2d 408, 412–13 (1963) (holding that informing contractor that results from any explorations and tests were available for inspection put the contractor on notice of all information included in field logs). The RB & G Report describes the soil as "relatively soft gray clay" and "interbedded sand and clay." RB & G Report at 2. These descriptions are clearly different from the "[w]eathered rock, dense consolidated deposits or conglomerate materials" that constitute hard material. *See* Solicitation Section 02221, ¶ 1.3.11. A reasonable contractor with knowledge of the information in the RB & G Report would not assume it would find hard material.

Plaintiff insisted at oral argument that even if it had examined the RB & G Report and discovered this ambiguity, all it would have discovered was an ambiguity between Section 02221, ¶ 1.6 and the RB & G Report. According to plaintiff, discovering this ambiguity would have left it with only two courses of action—either to refrain from bidding or to submit a bid that was unresponsive to Solicitation Section 02221, § 1.6. Trans. at 32–33. However, since Section 02221, ¶ 1.6 does not affirmatively indicate hard material, there is no contradiction or necessary ambiguity between that provision and the RB & G Report. The court has determined that the reference to "as indicated" takes precedence over any general references to hard material in Solicitation Section 02221.

The only possible ambiguity the court can detect between the text of the Solicitation and the RB & G Report is in the utilities section, Solicitation Section 02225, which stated both that the soil was "as indicated," referring to the RB & G Report description of softer soil, and that hard material "will be encountered." Solicitation Section 02225, ¶ 1.6. Even if the language of Solicitation Section 02225, read together with the RB & G Report, does create an ambiguity, it would be a patent ambiguity about which Comtrol would have had a duty to inquire. *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963) ("The bidder who is on notice of an incipient problem, but neglects to solve it ... cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter."); *Wayne Insulation Co.,* VABCA 2024, 86–2 BCA ¶ 18,890 at 95,304, 1986 WL 20693 ("If a bidder believes a solicitation to be ambiguous or discovers a conflict or an omission, it is incumbent upon the bidder to seek clarification prior to bidding."). Plaintiff made no such inquiry. By failing to inquire, Comtrol rendered its interpretation of the contract documents unreasonable. Plaintiff has therefore failed to demonstrate the second required element of a Type I differing site condition.

■ Third, Comtrol must show that it reasonably relied on the contract's indications of subsurface conditions. *Weeks,* 13 Cl.Ct. at 218. Reasonable reliance does not exist where a contractor bids without reviewing all contract indications. *A.S. McGaughan Co.,* 24 Cl.Ct. at 666 (finding it unreasonable not to inspect soil tests referenced in contract); *Youngdale & Sons Const. Co. v. United States,* 27 Fed.Cl. 516, 531–37 (1993) (finding it unreasonable and negligent to rely on contract indications without reviewing geologists' report); *Smith & Pittman Constr. Co.,* AGBCA 76–1314, 83–2 BCA 16,756 at 83,327–

18, 1983 WL 13139 (finding that contractor should have examined soil data referenced, but not included, in bid package). Plaintiff, having failed to review the RB & G report, and having thus failed to review all contract indications of subsurface conditions, cannot show that it reasonably relied on the contract's indications of soil and water conditions.

■ Plaintiff has failed to demonstrate either the second or third elements of a Type I differing site condition claim. It is irrelevant whether plaintiff might be able to demonstrate damages at trial because in no case will it be able to show either that it acted as a reasonably prudent contractor in interpreting the documents or that it reasonably relied on the indications of subsurface conditions in the contract. *See, e.g., Weeks* at 218. Defendant is therefore entitled to summary judgment that the soil and water conditions do not constitute Type I differing site conditions.

### 2. Concrete Duct Banks

■ The court now examines whether the existence of the three concrete duct banks constitutes a Type I differing site condition based on the necessary elements of a Type I claim. *See Weeks*, 13 Cl.Ct. at 218.

First, Comtrol must show that the contract documents affirmatively indicate the subsurface conditions. Paragraph 1.6 of Section 02221 of the Solicitation indicates that "[n]o pipes or other manmade obstructions, except those indicated, will be encountered." ¶ 1.6(b). Several drawings included in the Solicitation materials depict the construction site and the subsurface conditions there. See Solicitation Section 02221, ¶ 1.1.5 (referencing the drawings). These drawings constitute contract documents because they are referenced in the Solicitation. *See, e.g., Randa/Madison*, 239 F.3d at 1270–71; *A.S. McGaughan Co.*, 24 Cl.Ct. at 666; *Felton Constr. Co.*, AGBCA 406–9, 81–1 BCA ¶ 14,-932 at 73,904, 1981 WL 6985. The parties differ on whether these drawings depict the concrete duct banks, but neither party disputes that these drawings indicate the subsurface conditions. Pl.'s Resp. at 30–31; Def.'s MTD at 20; Trans. at 75–76. There-fore the first element of a Type I claim is present.

Second, Comtrol must show that it reasonably interpreted the contract documents. A reasonable interpretation is one based on all contract indications and documents. *See, e.g., Meyers Cos.*, 41 Fed.Cl. at 310; *Metric*, 44 Fed.Cl. at 520; *Allied Tech. Group*, 39 Fed.Cl. at 144. The contract documents include all drawings referenced in the Solicitation. *See, e.g., Randa/Madison*, 239 F.3d at 1270–71; *A.S. McGaughan Co.*, 24 Cl.Ct. at 666; *Felton Constr. Co.*, AGBCA 406–9, 81–1 BCA ¶ 14,932 at 73,904, 1981 WL 6985. Since the Solicitation references these drawings, plaintiff was also on notice of their contents. *See Randa/Madison*, 239 F.3d at 1270–72; *Flippin Materials Co.*, 312 F.2d at 412. Plaintiff contends that because the contract drawings do not contain lines or characters expressly labeled as "utilities" or "concrete duct banks," the utility duct banks are not apparent from the drawings. Pl.'s Resp. at 30–31. Defendant acknowledges that the contract drawings do not depict features identified as "duct banks," but contends that the drawings do indicate subsurface utility lines within the utility corridor, putting plaintiff on notice that it would encounter some type of utility conduits. Def.'s MTD at 19–20. A number of the drawings do include dotted lines running within the utility corridor along the southerly edge of the construction site, within a few feet of the ATCT excavation area. *See, e.g.*, Drawings NMD–600–41798–C1.2, -C1.3, -C1.4, -C1.5, -E1.1. These lines are identified with the labels "RWL," "T," and "PWR." Drawings NMD–600–41798–C1.2, -C1.3, -C1.4, -C1.5, -E1.1. Although the legends to these drawings do not specifically define "RWL" as "Runway Lighting," "T" as "Telephone," or "PWR" as "Power," these abbreviations are neither illogical nor obscure. One of the drawings with these labels also bears the title "Utility Plan." Drawing NMD–600–41798–C1.5. That title alone put plaintiff on notice that utilities were present and depicted somewhere on the drawing. The utility plan also shows symbols identified in the legend as "existing electrical manholes" over each of the utility lines. *Id.* According to defendant, such manholes

serve only as access to substantial utility structures, such as the concrete duct banks. Def.'s PFUF at ¶ 13.[7] Even absent these indications, the court notes that the language of the Solicitation put plaintiff on at least inquiry notice of existing utilities by including provisions for "[p]rotection of existing utilities and cables." Solicitation Section 01011, ¶ 13.1.

Plaintiff was therefore on notice both that subsurface utilities existed near the constructions site and that it was solely responsible under the contract for protecting them. With such notice, a reasonable contractor who entertained any uncertainties about the utilities after reviewing the drawings would have inquired about the precise location, nature, and condition of the utilities. Moreover, a contractor would have a duty to inquire about the utilities if the contract materials created any ambiguities. See, e.g., Beacon, 314 F.2d at 504; Wayne, VABCA 2024, 86–2 BCA ¶ 18,890 at 95,304. Plaintiff did not inquire about the definitions of the "RWL," "T," and "PWR" labels, the location of the utilities, or the manner in which those utilities were contained or protected. Def.'s MTD at 20–22; Trans. at 75–76. To proceed with excavation plans without making these inquiries is inconsistent with a reasonably prudent interpretation of the contract documents. Therefore, plaintiff acted unreasonably in forming its belief that the three concrete duct banks did not exist at the construction site.

The court finds that plaintiff was on notice that subsurface utilities existed near the construction site and that a reasonably prudent contractor would have either known about or inquired further about these utilities. See, e.g., Weeks at 218. There is no dispute that plaintiff did not investigate the location or nature and condition of the utilities prior to bidding. Therefore plaintiff's claim for summary judgment for Type I differing site conditions with respect to the duct banks fails. Defendant is entitled to summary judgment that the presence of the concrete duct banks does not constitute a differing site condition.

### 3. Chevron Pipeline

■ The court now considers whether the existence of the Chevron jet fuel pipeline in the utility corridor created a differing site condition based on the elements of a Type I differing site conditions claim. Weeks, 13 Cl.Ct. at 218.

First, plaintiff must show that defendant's contract documents affirmatively indicated the subsurface conditions. The parties are in agreement that the drawings referenced in the Solicitation depict the construction site and its subsurface conditions. Since these drawings constitute contract documents, the contract affirmatively indicates the subsurface conditions.

Second, Comtrol must show that it reasonably interpreted the contract documents. According to plaintiff, the Chevron pipeline it encountered was not disclosed anywhere in the contract. Pl.'s PFUF ¶ 19. However, one of the drawings referenced in the Solicitation specifically depicts a structure labeled as "Existing Chevron Pipeline (To be Relocated to New Utility Corridor by Others)." Pipeline Drawing. The Pipeline Drawing also indicates a proposed location for a "New Utility Corridor" which runs beneath a portion of the site that was later proposed as the location for the ATCT. Id. The Pipeline Drawing is one of several items listed, along with the RB & G Report, under "Project Specific Information." Solicitation Section 02221, ¶ 1.1.5. Since this drawing was one of the contract documents, plaintiff was on notice of its contents. See Randa/Madison, 239 F.3d at 1270–72; Flippin Materials Co., 312 F.2d at 412.

Although the Pipeline Drawing does not state when the pipeline will be relocated, it does put plaintiff on notice that a jet fuel pipeline recently existed and that its relocation was anticipated. The Pipeline Drawing also puts plaintiff on notice that the pipeline has been or will be relocated to the new utility corridor. Moreover, the Pipeline

---

7. Plaintiff denies that such manhole covers "connote or demonstrate the existence of a specific type of utility [or] of a buried duct bank," Plaintiff's Statement of Genuine Issues in Response to the Defendant's Proposed Findings of Uncontroverted Fact at 3, but any factual conflict on this point if immaterial because of the ample indication of utilities in the drawings.

Drawing indicates, in a quite arresting fashion, a possible impact on the construction of the ATCT. While the various other contract drawings depict a subsurface utility corridor running next to the ATCT site, the Pipeline Drawing raises the possibility of a jet fuel line located underneath a portion of the excavation site. This information should sound an alarm for any reasonable contractor examining the drawings. Plaintiff, however, did not inquire about the relocation of the Chevron pipeline or the actual location of the utility corridor prior to bidding. Trans. at 114–15, 134–39. A reasonable contractor, considering the information contained in the contract drawings—particularly the Pipeline Drawing—would not have assumed the non-existence of a subsurface jet fuel pipeline at the construction site. By making this assumption, however, plaintiff failed to act as a reasonable contractor and failed to interpret reasonably the contract documents relating to the Chevron pipeline.

The court finds that the Pipeline Drawing and other contract drawings placed plaintiff on notice that a Chevron jet fuel pipeline might exist at or near the construction site. The court also finds that a reasonable contractor would have inquired about its location and condition. Plaintiff will be unable to show that it acted reasonably when it failed to inquire about the pipeline. Therefore plaintiff's motion for summary judgment on this issue is denied. Defendant is entitled to summary judgment that the Chevron pipeline did not constitute a Type I differing site condition.

### D. Defective Contract Specifications

■ Plaintiff asserts that the contract plans and specifications were defective because they did not specify the soil and water conditions or subsurface obstructions that it encountered at the site. Compl. ¶¶ 5–10, 49. According to plaintiff, these defective specifications caused delays, disruptions, and extra work. Id. ¶ 49. The FAR provides for an equitable adjustment when the work performed is different from the work called for by the contract. FAR § 52.243–4(d); see Solicitation Part II, Section I (incorporating by reference FAR § 52.243–4). To recover,

a plaintiff must show that the contract's constructive changes arose because " '[t]he government's representative, by his actions or deeds [required] the contractor to perform work which is not a necessary part of [the] contract.' " *Shank–Artukovich v. United States,* 13 Cl.Ct. 346, 355 (1987) (quoting *Industrial Research Assocs., Inc.,* DCAB WB–5, 68–1 BCA ¶ 7,069 at 32,986), aff'd, 848 F.2d 1245 (Fed.Cir.1988).

When plaintiff encountered difficulties with rotation of the sheet piling, the FAA directed Comtrol to perform a number of remedial measures, including installing pumps, backfilling with gravel, redriving the sheet piles, and uncovering and repairing damage to the duct banks and Chevron pipeline. Compl. ¶¶ 23–30. For these measures to be "not a necessary part of [the] contract," they must be required by conditions not contemplated by the Solicitation materials. The remedial measures here are born of plaintiff's having undertaken excavation with the unwarranted expectation of encountering hard material and no subsurface obstructions. The court has found, however, that the contract did not affirmatively indicate that the site consisted of hard material. The contract also effectively indicated the presence and location of the concrete duct banks and Chevron pipeline. The court finds that the contract specifications were not defective with regard to the soil and water conditions, concrete duct banks, or the Chevron pipeline. Therefore the remedial measures were not work unnecessary to the contract. *See, e.g., Blake Const. Co., Inc. v. United States,* 28 Fed.Cl. 672, 689 (1993) (holding that a contractor's misinterpretation of contract specifications did not entitle it to equitable adjustment for constructive change), *aff'd,* 29 F.3d 645 (Fed. Cir.1994). Plaintiff's motion for summary judgment on this issue is denied. Defendant is entitled to summary judgment on plaintiff's claim of defective contract specifications.

### E. Good Faith and Fair Dealing

■ Plaintiff also seeks partial summary judgment that defendant breached its implied contractual duty of good faith and fair dealing by refusing to consider the possibility

**306**

that plaintiff had encountered quick conditions and differing site conditions. Pl.'s Mot. at 2. Like every government contract, Comtrol's contract with the FAA contained an implied duty of good faith and fair dealing. *See Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988) (applying the duty of good faith and fair dealing to a government contract); *Ebasco Servs., Inc. v. United States*, 37 Fed.Cl. 370, 382 (1997) ("Every government contract contains an implied covenant of good faith and fair dealing."). The Restatement defines good faith as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" to the exclusion of conduct that "violate[s] community standards of decency, fairness or reasonableness." Restatement (Second) of Contracts § 205; *see, e.g., Solar Turbines, Inc. v. United States*, 26 Cl.Ct. 1249, 1273–74 (1992) (finding the duty of good faith, as defined by the Restatement, applicable to government contracts).

According to plaintiff, defendant breached its duty of good faith by not considering "the potential possibility that Comtrol's claim, that it had encountered 'quick conditions'" and that it had encountered differing site conditions, had any merit," Pl.'s Mot. at 2, when it issued change orders and decided not to compensate plaintiff for any changes. *Id.* at 14–15, Trans. at 99–101. The fact on which plaintiff predicates its breach of good faith claim is the existence of Type I differing site conditions with respect to the soil and water conditions at the site. Defendant's alleged failure to account for differing site conditions when issuing change orders and to reimburse plaintiff could not, however, constitute a breach of good faith unless differing site conditions were in fact present for defendant to ignore. Since the court has found that Type I differing site conditions with respect to the soil and water conditions do not exist in this case, defendant cannot have breached an implied duty of good faith and fair dealing regarding those alleged differing site conditions. For these reasons the court denies plaintiff's motion for summary judgment for breach of the contractual duty of good faith with respect to the soil and water conditions at the site.

■ Defendant moves to dismiss plaintiff's Count III claim of breach of the contractual duty of good faith in its entirety, not just regarding the soil and water conditions, on the grounds that this court lacks jurisdiction under the Contract Disputes Act (CDA) because plaintiff did not previously submit the claim to the contracting officer for decision. Def.'s MTD at 4–8. For this court to have jurisdiction under the CDA, a plaintiff must first submit a claim to the contracting officer. 41 U.S.C. § 605(a); *United States v. W.H. Moseley Co.*, 730 F.2d 1472, 1475 (Fed.Cir. 1984) ("A contracting officer's decision ... [is] 'the linchpin for appealing claims under the Contract Disputes Act.'" (quoting *Paragon Energy Corp. v. United States*, 227 Ct. Cl. 176, 645 F.2d 966, 967 (1981))).

■ This court does have jurisdiction, however, if plaintiff's claims are "based on the same set of operative facts previously presented to the contracting officer." *Kunz Constr. Co. v. United States*, 12 Cl.Ct. 74, 79 (1987). In Count III of its complaint, Comtrol alleges the following instances of defendant's breach of its implied contractual duty of good faith and fair dealing:

a. The FAA withheld from Comtrol information and reports of FAA's consultant engineer.

b. The FAA failed to notify Comtrol of perceived deficiencies in its submittals.

c. The FAA failed to advise Comtrol of existing subsurface utilities.

d. The FAA interfered with the method and manner of work contemplated by Comrol.

e. The FAA demanded submittals not required by the contract, and then delayed the construction progress by failing expeditiously to approve the submittals.

f. The FAA refused to engage in good faith negotiation in resolving outstanding issues.

g. The FAA refused to permit action that would mitigate the damages, but rather imposed conditions upon Comtrol which increased the cost of construction and required accelerated construction schedules.

h. The FAA failed to work and negotiate with Comtrol in a cooperative manner pursuant to the "Project Alliance."

Complaint ¶ 57. Plaintiff submitted a Request for Equitable Adjustment Proposal (REA Proposal) on October 17, 1997, claiming costs arising from defective contract documents and delays and contract changes caused by the allegedly defective contract. REA Proposal at 1.[8] Defendant argues that the REA Proposal includes no allegations of breach of contract. Def.'s MTD at 7. An examination of plaintiff's claims in the REA Proposal, however, shows that those claims rely on the same set of operative facts as plaintiff's Count III breach of contract claims.

In the REA Proposal, plaintiff alleges that defendant withheld information from the contract documents. REA Proposal at 18. The facts that would support this claim would also support plaintiff's ¶ 57(a) claim that defendant withheld information in bad faith. Plaintiff also states that defendant required submittals for a ring beam to support the sheet pile shoring, duct banks, and dewatering system which, according to plaintiff, were not required by contract. REA Proposal at 7. The facts underlying this claim are the same as would support plaintiff's ¶ 57(e) claim that defendant required extra-contractual submittals in bad faith. According to plaintiff, defendant then refused to accept the results of the geotechnical and engineering studies it had required plaintiff to submit. *Id.* at 6. The facts that would support this claim should be the same facts as would support plaintiff's ¶ 57(b) claim that defendant failed to notify plaintiff of deficiencies in its submittals. Plaintiff also claims that the Solicitation did not describe the concrete duct banks. REA Proposal at 9. The facts supporting this claim are the same as would support plaintiff's ¶ 57(c) claim that defendant in bad faith failed to advise it of the subsurface utilities. Plaintiff describes numerous change directives and design modifications required throughout the course of construction. REA Proposal at 10–14.

Comtrol characterizes defendant's behavior in relation to these changes as "a uniform and consistent program of delaying and postponing consideration or discussion of ... issues until project completion." *Id.* at 15. The facts underlying these claims appear to be the same as would support plaintiff's ¶ 57(d) claim for interference with work, ¶ 57(f) claim for failure to negotiate in good faith, ¶ 57(g) claim for imposing conditions that increased costs an accelerated the schedule, or ¶ 57(h) claim for failure to negotiate cooperatively.

The court notes that different claims drawing on similar facts do not necessarily arise from the same set of operative facts. *See, e.g., J. Cooper & Assocs., Inc. v. United States,* 47 Fed.Cl. 280 (2000) (finding that a breach of contract claim did not arise from the same set of operative facts as a claim for termination costs because they involved different costs and liabilities). In this case, however, the court finds that plaintiff's claims for increased costs and accelerated schedules do arise from the same circumstances, involve the same behavior by defendant, and result in the same set of alleged damages, regardless of whether the legal theory behind the claim is that defendant produced defective contract documents and failed to adjust properly for them, or that defendant breached its implied duty of good faith and fair dealing.

For the foregoing reasons, the court finds that plaintiff's Count III breach of contract claim arises from the same set of operative facts as its defective contract claim filed before the contracting officer. Since the same operative facts are at play, this court has jurisdiction over the issue. Defendant's motion to dismiss for want of jurisdiction is denied.

Defendant has not cross-moved for summary judgment on plaintiff's breach of contractual duty of good faith claims. However, a court may enter summary judgment for a nonmoving party without a formal cross-motion when the practice would be in keeping with the objective of summary judgment to

---

**8.** The REA Proposal appears at Tab A in Vol. I of the documents filed with the court on November 29, 1999. *See supra,* n. 3.

expedite the disposition of cases. 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2720 (1998) ("The weight of authority ... is that summary judgment may be rendered in favor of the opposing party even though the opponent has no formal cross motion under Rule 56."); *see, e.g., Massey v. Del Laboratories, Inc.,* 118 F.3d 1568, 1572 (Fed.Cir.1997) (raising summary judgment sua sponte for non-movant where parties had engaged in extensive cross motions for summary judgment). This practice is appropriate when the factual record is well developed and the original moving party has had an adequate opportunity to enter evidence supporting its summary judgment motion. *See Massey* at 1572. Here, plaintiff has had ample opportunity to ventilate fully its breach of good faith claims. Moreover, because these claims rely on the underlying claims of Type I differing site conditions and defective specifications, plaintiff's breach of good faith claims are at their core matters of contract interpretation, not factual determination.

These circumstances, as well as the interests of judicial efficiency, call for the court to recognize the appropriateness of summary judgment in this case. Plaintiff's claim of breach of the contractual duty of good faith charges defendant with failing to recognize and respond to the existence of differing site conditions and defective specifications. The court has found that Type I differing site conditions and defective specifications are not present in this case. Defendant's failure to recognize and respond to differing site conditions or defective specifications is not a breach of good faith when neither exists. The court therefore grants summary judgment for defendant on all aspects of plaintiff's Count III bad faith claims.

**F. Motions to Strike Affidavits**

Plaintiff has moved to strike the affidavits of Michael R. Todd and Guy Hall. The court did not rely on these affidavits in its decision. Plaintiff's motions to strike are therefore moot as they relate to plaintiff's motion for summary judgment and defendant's cross-motions for summary judgment and motion to dismiss for lack of jurisdiction.

**III. Conclusion**

For the foregoing reasons, the court, having denied the parties' motion to Stay Counts I, II, and III as moot, DENIES plaintiff's motion for partial summary judgment on Count I, differing site conditions, and GRANTS defendant's cross-motion for summary judgment on Count I. The court DENIES plaintiff's motion for partial summary judgment on Count II, defective specifications, and GRANTS defendant's cross-motion for summary judgment on Count II. The court DENIES plaintiff's motion for partial summary judgment and defendant's motion to dismiss on Count III for breach of the implied duty of good faith and fair dealing, and GRANTS summary judgment for defendant on Count III. Counts IV and V are dismissed with prejudice in accordance with the parties' joint stipulation of dismissal, filed April 12, 2001. The court directs the Clerk of the Court to enter final judgment in favor of defendant.

IT IS SO ORDERED.