**COMTROL, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–5115.

United States Court of Appeals, Federal Circuit.

June 26, 2002.

Jack L. Schoenhals, of Salt Lake City, Utah, argued for plaintiff-appellant. Of

counsel on the brief were Richard J. Webber, and Natalie Stoney Walters, Arent Fox Kinter Plotkin & Kahn, PLLC, of Washington, DC.

Kent G. Huntington, Attorney, Commercial Ligitation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Kathryn A. Bleecker, Assistant Director. Of counsel on the brief was Karen D. Huber, Attorney, Office of Regional Counsel, Federal Aviation Administration, of Renton, Washington.

Before NEWMAN, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

Comtrol, Inc. ("Comtrol") appeals the decision of the Court of Federal Claims granting summary judgment that Comtrol is not entitled to an equitable adjustment of a contract between Comtrol and the Federal Aviation Administration ("FAA") for construction work at the Salt Lake City International Airport, and that Comtrol is not entitled to damages for breach of that contract. *Comtrol, Inc. v. United States*, 49 Fed. Cl. 294 (2001).

Comtrol urges five claims on appeal: 1) a claim for differing site conditions and defective specifications based on the presence of quicksand at the site; 2) a claim for differing site conditions and defective specifications based on the placement of a fuel pipeline; 3) a claim for additional costs relating to alleged improvements to three underground duct banks; 4) a claim for additional costs including overhead, time, and acceleration costs resulting from numerous change orders, the direct costs of which have already been resolved by the parties; and 5) a claim for breach of the implied contractual duties of cooperation, non-interference with contract, and good faith and fair dealing.

As to the first claim, we hold that the soils encountered did not constitute differing site conditions because the specification did not indicate that only hard materials would be encountered at the site, and because Comtrol cannot rely on an engineering report that it did not review before award. We similarly reject the defective specifications claim. As to the differing site conditions and defective specifications claims relating to the fuel pipeline, we hold that the contract was ambiguous as to the existence and location of the pipeline, but that the ambiguity was patent, barring recovery. As to the claim relating to additional costs for alleged improvements of the duct banks, we hold that the Court of Federal Claims erred by treating the issue as depending entirely on the site conditions claim. We vacate and remand for further consideration of that claim. As for the claim relating to additional costs resulting from certain unresolved change orders, we hold that the Court of Federal Claims erred in failing to specifically address this claim, and vacate and remand for further proceedings. As for the breach of contract claim, we hold that the Court of Federal Claims erred in finding that this claim depended entirely on Comtrol's ability to prove differing site conditions, and vacate and remand for further proceedings. Thus, we affirm in part, vacate in part, and remand.

## BACKGROUND

In December 1994, FAA invited bids for a firm, fixed-price contract to construct an air traffic control tower and base building at the Salt Lake City International Airport. The contract was awarded to Comtrol on April 6, 1995.

### 1. Soil Conditions

The Solicitation included the standard Federal Acquisition Regulation ("FAR")

clauses for differing site conditions and site investigations, 48 C.F.R. §§ 52.236–2 and 52.236–3 (1994), and the standard changes clause, 48 C.F.R. § 52.243–4 (1994).

Paragraph 1.6 of the Solicitation stated that "Hard material ... may be encountered," and paragraph 1.3.11 defined "[h]ard [m]aterial" as "[w]eathered rock, dense consolidated deposits or conglomerate materials which are not included in the definition of 'rock' but which usually require the use of heavy excavation equipment with ripper teeth or the use of jack hammers for removal." Paragraph 1.7.2 directed bidders to include in their bids "the collection and disposal of surface and subsurface water encountered in the course of construction." Paragraph 1.7.1 provided that "[t]he Contractor shall have the option to provide shoring and sheeting." The Solicitation stated that a site visit was encouraged and noted that prior arrangements were not necessary for bidders to visit the FAA site.

Paragraph 1.1.5 of the Solicitation, entitled "Project Specific Information," incorporated by reference a soils report prepared by RB & G Engineering, Inc. dated August 1993 ("RB & G Report"), and four sets of construction drawings. The RB & G Report and construction drawings were maintained at the offices of FAA's architect. Comtrol did not review the RB & G Report before submitting its bid.

The RB & G Report made numerous representations as to the soil conditions at the site. The Report stated that "the subsurface material in the upper 6.5 to 10 feet in Test Holes 1 through 4 consists of a relatively soft gray clay. The remainder of the soil profile in these four borings generally consisted of interbedded sand and clay layers," and noted that "all of the subsurface materials are natural deposits." The Report stated that the soils investigated had recently been saturated with water

and that groundwater was encountered at an approximate depth of seven feet for one test hole and two feet for the remaining test holes. The Report further stated that "standard penetration tests indicate that the cohesive material in the upper portion of the soil profile is in a medium stiff condition. The sandy material throughout the soil profile is generally in a medium dense state;" that "[t]est hole 5 defines the characteristics of the subsurface material;" that it "is apparent from this boring that most of the subsurface material in the upper portion of the profile consists of cohesive material;" and that "the results of these tests indicate that the cohesive material in the upper portion of the soil profile is in a medium stiff condition."

Soon after award, Comtrol proceeded with the excavation by driving a sheet pile wall around the perimeter of the excavation to contain groundwater. When Comtrol began excavating within the sheet pile walls, it encountered loose sand and water. Quick conditions were created when the high water table at the site exerted pressure on this loose sand and water. The surrounding soils then subsided and the sheet piling failed, damaging a nearby duct bank.

2. Chevron Pipeline

Paragraph 1.6 of the Solicitation stated that "No pipes ... except those indicated, will be encountered." However, one of the drawings referenced in paragraph 1.1.5 of the Solicitation (the "Pipeline Drawing") depicted a structure labeled "Existing Chevron Pipeline" and noted that this pipeline was "to be relocated to new utility corridor by others." The drawing also indicated a proposed location for the "New Utility Corridor" running beneath a portion of the site that was later proposed as the location of the tower. These drawings were maintained at the offices of FAA's

architect. Comtrol did not request or obtain these drawings until after the failure of the sheet pile wall.

Comtrol found the pipeline after award when it used precautionary measures to locate and identify existing subsurface features. This pipeline had been relocated after the preparation of the RB & G Report in August 1993, but before FAA invited bids in December 1994.

### 3. Duct Banks

After the sheet pile failed, FAA directed Comtrol to uncover and perform additional work on two nearby duct banks that were not damaged during excavation. Comtrol wrapped the two duct banks in reinforcing steel, constructed new concrete forms, and poured concrete into the forms around the reinforcing steel. Comtrol alleged that this work was unnecessary to cope with the subsidence of the soil because these two duct banks were not affected by the subsidence of the soil. FAA further directed Comtrol to insert permanent subsurface supports under all three duct banks, including the damaged duct bank. Comtrol alleged that the work it performed on the undamaged duct banks constituted unnecessary improvements, and that the work it performed on the damaged duct bank exceeded what was necessary to repair the damage.

### 4. Change Orders

Throughout the work, FAA issued 142 Proposed Contract Changes ("PCCs") modifying the plans and specifications. FAA paid Comtrol the direct costs of these change orders. The parties differ as to whether the indirect costs were resolved.

### 5. Breach of Contract

Finally, Comtrol alleged that FAA breached its implied contractual duties of cooperation, non-interference with work, and good faith and fair dealing.

On December 22, 1997, Comtrol certified a claim for equitable adjustment that it had presented to FAA in October 1997. The FAA contracting officer issued final decisions on Comtrol's claims on May 27, 1998, and October 15, 1998, granting partial relief.

### PROCEEDINGS BELOW

On May 24, 1999, Comtrol filed a complaint with the Court of Federal Claims, seeking compensation for the five items described above. The parties filed cross-motions for summary judgment as to all claims except the breach of contract claim. The Court of Federal Claims granted summary judgment that the soil and water conditions did not constitute Type I differing site conditions, finding that the documents did not represent that quick conditions would not be encountered, and that, in any event, Comtrol did not reasonably rely on an engineering report because it did not review that report. *Comtrol*, 49 Fed. Cl. at 302–03. For the same reasons, the court rejected Comtrol's defective specifications claim. *Id.* at 305. The court granted summary judgment that the pipeline did not constitute a differing site condition or result from a defective specification because construction drawings put Comtrol on notice that the pipeline existed, and a reasonably prudent contractor would have either known of the pipeline or inquired further about it. *Id.* at 304–05. The court further granted summary judgment that Comtrol was not entitled to costs relating to the duct banks, concluding that "[t]he remedial measures here are born [sic] of [Comtrol's] having undertaken excavation with the unwarranted expectation of encountering hard material and no subsurface obstructions." *Id.* at 305. The court did not specifically address Comtrol's claim regarding the 142 change orders. Finally, the court *sua sponte* granted summary judgment that the government did

not breach its implied contractual duties after finding that Comtrol's recovery depended on its ability to establish differing site conditions and defective specifications, claims which the court already rejected. *Id.* at 308.

Comtrol timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## STANDARD OF REVIEW

We review a trial court's grant of a motion for summary judgment without deference. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330 (Fed.Cir.2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## DISCUSSION

### I

■ Comtrol's differing site conditions and defective specifications claims both arise from Comtrol's allegedly unexpected encounter with quicksand in the course of construction. Comtrol alleges (1) that the quicksand constituted a differing site condition, and (2) that the specification was defective for failure to disclose the presence of quicksand. Although differing site conditions and defective specifications claims are distinct in theory, they collapse into a single claim under facts such as these, where the alleged defect in the specification is the failure to disclose the alleged differing site condition. Where the differing site conditions claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause.

■ Type I differing site conditions consist of "subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract." FAR § 52.236–2(a)(1) (1994). To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions. *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998).

Comtrol claims that it interpreted the Solicitation as representing that Comtrol could expect to encounter relatively dense and cohesive materials, not loose, sandy materials that would lead to quick conditions. Comtrol relies on Paragraph 1.6, which stated that "Hard material . . . may be encountered." While conceding that that provision does not affirmatively indicate that *only* hard materials would be encountered, Comtrol contends that Paragraph 1.6, taken together with other provisions, "implied that the soils to be encountered would consist of dense, cohesive materials which could be safely excavated without any protective measures." The "other provisions" upon which Comtrol relies include: paragraph 1.7.1, which Comtrol argues indicated that the soils would be stable and self-supporting, since the contractor could, at its option, excavate the soil without providing any shoring or sheeting; paragraph 1.7.2, which Comtrol argues suggested that standard dewatering procedures could be utilized and supported the inference that the water table need not be lowered before excavation;

and certain contract drawings that allowed the contractor to brace any shoring after excavation had been completed, thereby implying, argues Comtrol, that the soils would remain stable and self-supporting during excavation.

The Court of Federal Claims concluded that the Solicitation "states only that [hard material] 'may' exist," and that "[a]ssuming the pervasive existence of hard material from this statement is not reasonable." *Comtrol*, 49 Fed. Cl. at 302.

■ A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). Here, the specification did not affirmatively represent that only hard material would be encountered. Because the contract made no specific representation as to the type of soil to be encountered, it cannot be said that Comtrol encountered conditions materially differing from those specifically indicated in the specification. In this respect we conclude that the Court of Federal Claims was correct.

■ However, Comtrol urges that, even if the specification did not represent that only hard material would be encountered, the government's RB & G Report suggested that the contractor would encounter "dense and cohesive materials" that would require no shoring or sheeting during excavation. Comtrol cites the following passages from the RB & G Report as indicating that dense and cohesive material would be encountered:

> standard penetration tests indicate that the cohesive material in the upper portion of the soil profile is in a medium stiff condition. The sandy material throughout the soil profile is generally in a medium dense state.... Test Hole 5 defines the characteristics of the subsurface material to a depth of 100 feet. It

is apparent from this boring that most of the subsurface material in the upper portion of the profile consists of cohesive material, [and] .... the results of these tests indicate that the cohesive material in the upper portion of the soil profile is in a medium stiff condition.

Comtrol contends that examining the RB & G Report would not have caused it to act differently in its bidding or excavation.

The Court of Federal Claims disagreed, finding that the RB & G Report "does not indicate hard materials, but rather 'relatively soft gray clay' and 'an interbedded sand and clay layer.'" *Comtrol*, 49 Fed. Cl. at 301. Comtrol argues that the Court of Federal Claims erred by interpreting the technical RB & G Report without the benefit of expert testimony, and that there is at least a genuine issue of material fact as to whether the RB & G Report suggested that quick conditions would not be encountered.

We need not resolve this question because Comtrol faces an insurmountable problem—it never reviewed the RB & G Report before submitting its bid. The Report was incorporated by reference under the heading "Project Specific Information" in Paragraph 1.1.5 of the Solicitation, and was therefore part of the contract. *See Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1270–71 (Fed.Cir. 2001). Comtrol failed to obtain and review this contract document, and cannot now rely on that document to support either its differing site conditions or defective specifications theory.

■ It is well-established that a crucial element of both a differing site conditions claim and a defective specifications claim is reliance. To prevail on a differing site conditions claim, the contractor must show reliance on the representations in the contract. *H.B. Mac*, 153 F.3d at 1345 ("[T]o establish entitlement to an equitable ad-

justment by reason of a Type I differing site condition: ... [t]he contractor ... must show that it reasonably relied upon its interpretation of the contract and contract-related documents....")". In the closely related area of defective specifications, we have recently held in *Robins Maintenance, Inc. v. United States*, 265 F.3d 1254, 1257 (Fed.Cir.2001), that where a contractor seeks an equitable adjustment based on a theory of defective specifications, there can be no recovery unless the contractor was actually misled by the erroneous statements in the specifications. There can be no recovery if there was no reliance.

Reasonable reliance cannot exist where the contractor bid without having reviewed the contract documents on which it seeks to rely. Comtrol, having failed to review the RB & G Report, and having thus failed to review all contract documents concerning subsurface conditions, cannot show that it reasonably relied on the RB & G Report's description of soil and water conditions. *See Youngdale & Sons Const. Co. v. United States*, 27 Fed. Cl. 516, 535 (1993) (finding it unreasonable not to inspect soil tests referenced in the contract); *Donald R. Stewart & Assocs.*, AGBCA No. 84–226–1, 92–1 BCA ¶ 24,705 (Jan. 16, 1992) (denying equitable adjustment for differing site conditions claim, despite finding that the contractor encountered conditions materially different from the conditions indicated in a geologist report, because the contractor did not review the report before bidding, and therefore could not have relied on the report in preparing its bid).

Comtrol asserts that our recent decision in *Randa/Madison* establishes the contrary. In *Randa/Madison*, we held that where a claim is made for differing site conditions, the contractor will be charged with knowledge that it could have obtained by reviewing available bid documents. *Randa/Madison*, 239 F.3d at 1270–71. Where the contractor had notice of the site conditions from available bid documents, it cannot later defend on the ground that it did not review those documents. *Id.* at 1272. *Randa/Madison* does not help Comtrol. That case establishes that the contractor is charged with knowledge it could have gained from contract documents. It does not allow the contractor to rely on documents that it never read.

Comtrol complains that the RB & G Report was not provided during the bid period, despite its verbal request at a preconstruction meeting. We may assume that this is factually correct, but these facts are irrelevant. Nothing required Comtrol to bid on the contract. If it chose to bid without securing the relevant bid documents, it has only itself to blame. It cannot bid in ignorance and then base a claim for equitable adjustment on a document that it did not review.

Because we agree with the Court of Federal Claims that Comtrol's interpretation of the contract documents that it did in fact review is not reasonable and because Comtrol cannot rely on documents it did not review, we affirm the dismissal of Comtrol's differing site conditions and defective specifications claims.[1]

1. Comtrol also seeks additional costs for its repair of the damaged duct bank, but admits that its entitlement to repair costs depends upon its ability to show that the quicksand constitutes a differing site condition. Because we have determined that the quicksand was not a differing site condition, Comtrol cannot recover costs for its repair of the damaged duct bank. We discuss below Comtrol's claim for costs for work performed on this duct bank that Comtrol argues exceeded repair.

## II

■ Comtrol's second claim for differing site conditions and defective specifications is based on the placement of the Chevron pipeline in the utility corridor. Comtrol claims that the pipeline was not disclosed in the contract, and notes that paragraph 1.6 of the Solicitation states that "[n]o pipes . . ., except those indicated, will be encountered." But the Pipeline Drawing specifically depicted a structure labeled "Existing Chevron Pipeline" and notes that it is "to be relocated to [the] new utility corridor by others." The Pipeline Drawing further indicated the proposed location for the "New Utility Corridor" as running beneath a portion of the site that was later proposed as the location of the tower. This drawing was one of several listed, along with the RB & G Report, under the headline "Project Specific Information," and is therefore one of the contract documents of which Comtrol is charged with knowledge. *Randa/Madison*, 239 F.3d at 1270–71.

■ The Court of Federal Claims considered these documents and concluded that "[t]his information should [have] sound[ed] an alarm for any reasonable contractor examining the drawings." *Comtrol*, 49 Fed. Cl. at 305. The court concluded that "[a]lthough the Pipeline Drawing does not state when the pipeline will be relocated, it does put [Comtrol] on notice that a jet fuel pipeline recently existed and that its relocation was anticipated." *Id.* at 304. The court found that a reasonable contractor would have inquired about the location and condition of the pipeline, and dismissed Comtrol's differing site conditions claim as to the Chevron pipeline. The court did not separately address Comtrol's defective specifications claim.

■ We agree with the Court of Federal Claims. The documents were on their face ambiguous. They did not indicate when the pipeline would be relocated, *i.e.*, whether the pipeline would be relocated before, during, or after construction, or whether the old or the new pipeline or neither would be encountered by the contractor. Nonetheless, we hold that Comtrol cannot recover because any ambiguity in the documents was patent. A patent ambiguity is one that is glaring, substantial, or patently obvious. *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993). A contractor has a duty to seek clarification of a patent ambiguity. *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1375 (Fed. Cir.2002); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed.Cir.1996). It is undisputed that Comtrol failed to inquire about the relocation of the Chevron pipeline or the actual location of the utility corridor before bidding. We agree with the Court of Federal Claims that the Pipeline Drawing and the other contract drawings placed Comtrol on notice that a fuel pipeline might exist at or near the construction site, and that Comtrol had a duty to seek clarification of this ambiguity. Therefore, Comtrol cannot establish a differing site conditions claim or defective specifications claim relating to the pipeline because it cannot establish that it acted as a reasonably prudent contractor in interpreting the contract documents. We affirm the grant of summary judgment as to this claim.

## III

■ Comtrol seeks additional costs, unrelated to the differing site conditions claims, for work that FAA directed Comtrol to perform on three duct banks. As to the two undamaged duct banks, Comtrol alleges that the improvements FAA directed it to make were unnecessary to cope with the subsidence of the soil. As to the damaged duct bank, Comtrol alleges that the measures FAA directed it to carry out

far exceeded what was necessary to repair the damage, and constituted unnecessary improvements. The Court of Federal Claims did not address this claim. Rather, after concluding that Comtrol failed to establish any differing site conditions, the court assumed that all "remedial" costs were necessary to the contract, and accordingly unrecoverable, and concluded that "[t]he remedial measures here are born [sic] of [Comtrol's] having undertaken excavation with the unwarranted expectation of encountering hard material and no subsurface obstructions." *Comtrol,* 49 Fed. Cl. at 305. We agree with Comtrol that the court erred in granting summary judgment as to these additional costs. We do not decide here whether these additional costs were necessarily incurred because of the soil subsidence, in which event they would not be recoverable, or whether they constituted extra work under the contract. We simply decide that this issue cannot be resolved in favor of the government on this summary judgment record, and remand for further consideration.

### IV

Comtrol complains that the Court of Federal Claims did not consider its equitable adjustment claims relating to 142 change orders that were unrelated to Comtrol's differing site conditions claims. These change orders were settled as to direct costs, but not as to overhead, time, and acceleration costs. Comtrol seeks these additional costs.

The Court of Federal Claims did not specifically address Comtrol's claim for additional costs related to the 142 change orders. Comtrol argues that this was error.

It appears that some or all of these changes were unrelated to the alleged differing site conditions. The government ignored this claim in its brief, limiting its comments to "remedial measures" relating to the alleged differing site conditions. At oral argument, the government urged that this claim had been resolved by agreement under "Modification 0006." The proposed Modification 0006 contained language stating that "[t]his modification represents a mutual agreement of both parties that provides an equitable adjustment for all indirect costs such as premium time, scheduling, additional supervision, and extended field overhead, associated with proposed contract changes 1 through 120." FAA contends that this language establishes that those change orders have been resolved.

Comtrol disagrees, and asserts that correspondence between FAA and Comtrol establishes that these additional costs were not resolved. In an October 23, 1996, letter to FAA, Comtrol objected to Modification 0006, because it "contained a paragraph that appeared to foreclose in favor of the FAA any future consideration of the cost and time issues associated with PCC's 1–120." The letter further stated that "direct and indirect costs have not yet been negotiated for many PCC's numbered between 1 and 120," that "Comtrol had a concern that modification 0006 might be viewed as a means to limit the range of future negotiations," and that "Comtrol has been assured that this is not the case."

Comtrol further argues that FAA recognized that compensation for overhead, indirect costs, and time would be deferred until completion of the contract, and that the contracting officer admitted in his Final Decision that additional amounts were due Comtrol. Comtrol cites a May 13, 1996, letter from FAA to Comtrol in which FAA urges Comtrol to respect an "agreement to assess unabsorbed overhead at the end of the project," and the Final Decision in which the contracting officer included a chart entitled "Entitlement Determination" with an entry for $204,418 for "Unre-

solved Changes." No mention was made of claims 121–142 in any of these documents cited by FAA or Comtrol.

We remand to the Court of Federal Claims for further proceedings concerning the effect of the alleged settlement agreement of Modification 0006, and for further proceedings concerning Comtrol's claims relating to the change orders not dependent on the site conditions issue, to the extent that those claims have not been resolved by settlement.

## V

Finally, Comtrol argues that the Court of Federal Claims erred by dismissing its breach of contract claim seeking damages for FAA's breach of its implied contractual duties of cooperation, non-interference with work, and good faith and fair dealing. Comtrol alleged that during the project, FAA engaged in conduct constituting multiple breaches of these duties. The Court of Federal Claims granted summary judgment *sua sponte* in favor of the government after concluding that the issues underlying the claim were the same as those on which the court had already ruled against Comtrol on the differing site conditions and defective specification claims:

> [Comtrol]'s claim of breach of the contractual duty of good faith charges [FAA] with failing to recognize and respond to the existence of differing site conditions and defective specifications. The court has found that Type I differing site conditions and defective specifications [were] not present in this case. [FAA]'s failure to recognize and respond to differing site conditions or defective specifications is not a breach of good faith when neither exists.

*Comtrol,* 49 Fed. Cl. at 308. We agree with Comtrol that the decision in favor of the government on the differing site conditions claim did not resolve this claim in its entirety, and remand for further proceedings. The Court of Federal Claims should consider on remand what part of the claim of breach of the implied contractual duties of cooperation, non-interference with work, and good faith and fair dealing relate only to the differing site conditions and defective specification claims, and should address on remand those claims that are not so dependent.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

## COSTS

No costs.