# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| David Boland, Inc. | )    ASBCA Nos. 61923, 61924, 61925 |
| | ) |
| Under Contract No. W9128A-12-C-0009 | ) |

APPEARANCES FOR THE APPELLANT:    Christopher P. Sobba, Esq.
   Denis L. Durkin, Esq.
    James Sobba, LLC
    Kansas City, MO

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
   Nathan Kanale Sadowski, Esq.
    Engineer Trial Attorney
    U.S. Army Engineer District, Honolulu

## OPINION BY ADMINISTRATIVE JUDGE SWEET

These appeals involve three pass-through claims on behalf of a subcontractor related to a contract for the construction of infrastructure. In ASBCA No. 61923, appellant David Boland, Inc. (Boland) alleges that the condition encountered of an existing telecommunications line being concrete-encased differed materially from either the condition indicated in the contract documents, or the known or usual conditions. In ASBCA No. 61924, Boland alleges that the government constructively changed the contract when it directed Boland to install a temporary power pole farther away from a non-directional beacon (NDB) than required by the contract. In ASBCA No. 61925, Boland alleges that the government constructively changed the contract when it directed Boland to use structural backfill – instead of the native materials that the specifications allegedly required – for a box culvert.

Pursuant to Board Rule 11, the parties have elected to waive a hearing and submit these appeals upon the record. After reviewing the parties' filings, we conclude that Boland has failed to meet its burden of proving that there was a differing site condition or a constructive change. Therefore, we deny these appeals.

FINDINGS OF FACT

I.       General Facts

        1.  On June 29, 2012, the United States Army Corps of Engineers (government) awarded Contract No. W9128A-12-C-0009 (0009 Contract) to Boland, which required Boland to construct infrastructure for the Combat Aviation Brigade at Wheeler Army Air Field (WAAF) in Hawaii in exchange for $54,772,000 (R4, tab A-2 at 26-27).

        2.  The 0009 Contract included a FAR 52.243-4(d), CHANGES (JUN 2007) clause, which required the government to provide an equitable adjustment for any changes to the 0009 Contract (gov't supp. R4, tab A-2 at 162).[1]

        3.  Boland subcontracted with Kingston Environmental Services d/b/a Sealaska Civil (Kingston) to perform civil and earth work activities (gov't supp. R4, tab A-11 at 9,198, 9210).

II.      Facts Specific to ASBCA No. 61923 (Telecommunications Line)

        4.  As part of the project, Boland had to install an underground box culvert (app. second supp. R4, tab 7 at 122).

        5.  The general notes to the drawings stated that "unless relocation is called for on the plans, existing utilities shall remain in-service and in place" (gov't supp. R4, tab A-2 at 3,891 at General Note 8).

        6.  Drawing EI-113 of the 0009 Contract showed an existing telecommunications line (Line) crossing the location where the 0009 Contract required Boland to construct the box culvert, and did not call for relocation of the Line (gov't supp. R4, tab A-2 at 3,534, tab A-5 at 8,356-57).

        7.  Drawing EI-113 did not positively indicate that the Line was exposed, and thus free of concrete-encasement (gov't supp. R4, tab A-2 at 3,534).

        8.  As the government's quality assurance representative and project engineer declare, a reasonable contractor would not assume that buried telecommunications lines would be exposed, or lack concrete-encasement (gov't supp. R4, tab A-4 ¶ 20, tab A-5 ¶ 26).

_____

[1] All citations to "gov't supp. R4" are to the government's revised supplemental R4 filing.

9. On the contrary, a reasonable contractor would have concluded that the Line was concrete-encased for two reasons. First, drawing EI-113 did not represent the Line with a dashed line (- - - -), which the drawings defined as "CONDUIT & WIRING EXPOSED." Rather, drawing EI-113 represented the Line with alternating long and short dashes (— – —), which the drawings defined as an "UNDERGROUND DUCTLINE." (Gov't supp. R4, tab A-2 at 3,520, 3,534) The 0009 Contract § 26 56 20.00 10, ¶ 3.6.3 (¶ 3.6.3) indicated that "[e]ach single duct shall be completely encased in concrete" (id. at 1,540; see also id. at 3,556, 3,567, 3,775 (providing drawings of ducts showing concrete-encasement)). Second, a call-out from the Line in drawing EI-113 identified the Line as "D1," (id. at 3,534), which the drawings showed was a concrete-encased line (id. at 3,557).

10. When Kingston encountered the Line while excavating for the box culvert, it found that the Line was concrete-encased (gov't supp. R4, tab B-5 at 3,287).

11. Boland claims that the drawings did not show that the Line was concrete-encased, and that maintaining a concrete-encased line in-service and in place increased Kingston's costs by $26,070 (compl. ¶¶ 12, 19).

III. Facts Specific to ASBCA No. 61924 (Temporary Power Pole)

12. The drawings permitted the construction of structures of up to 7.62 meters (25 feet) in height between 61 meters (200 feet) and 122 meters (400 feet) in distance from the NDB (gov't supp. R4, tab A-2 at 3,904-05, 3,907-08).[2]

13. In May or June 2013, the government met with WAAF Operations personnel, who stated that Boland could not locate a 25 foot proposed temporary power pole (Pole) within 304.8 meters (1,000 feet) of the NDB (gov't supp. R4, tab A-5 at 8,354 ¶ 11).

14. On June 19, 2013, Boland emailed the government's project engineer, stating that Boland read the drawings to allow the 25 foot pole between 61 meters (200 feet) and 122 meters (400 feet) from the NDB (gov't supp. R4, tab C-8 at 104-05). In response, the project engineer "did not . . . provide any official direction in regards to the location of temporary power poles" (gov't supp. R4, tab A-5 at 8,354 ¶ 14). Rather, the project engineer responded to Boland by agreeing that, "[y]es, per contract, radii from 61M to 122 M from center of the NDB should not have anything over 25-ft (7.62M)." While the project engineer continued, "[h]aving said that, I still need to confirm where AE obtained this requirement and compare [it] against the restriction of

---

[2] The drawings show metric measurements. We take judicial notice of the conversion from metric to imperial measurements.

3

1,000-ft recently identified by Airfield Ops," there were no further discussion between Boland and the government regarding the Pole. (Gov't supp. R4, tab C-8 at 104)[3]

15. Boland claims that Kingston incurred $2,212 in extra costs because it had to abandon a pole pad it had constructed for the Pole within 400 feet of the NDP and construct a new pole pad in order to comply with the purported direction not to build the Pole within 1,000 feet of the NDB (compl. ¶¶ 21-23, 28). However, Boland ultimately constructed the Pole within 1,000 feet of the NDB (gov't supp. R4, tab A-7 at 8,360, Interrogatory Response 6).

IV.    Facts Specific to ASBCA No. 61925 (Box Culvert Backfill)

16. Both the box culvert and other aspects of the project required backfill (app. second supp. R4, tab 7 at 122).

17. Specification § 31 00 00, subsection 1.4.11 (subsection 1.4.11) gave Boland, at most, some discretion as to the type of backfill to use, stating that "[i]nitial backfill consists of select granular material or satisfactory materials free from rocks 25 mm or larger in any dimension or free from rocks of such size as recommended by the pipe manufacturer, whichever is smaller." Subsection 1.4.11 did not mention box culvert backfill specifically, or require Boland to use native materials for box culvert backfill in particular. (Gov't supp. R4, tab A-2 at 1,620)

18. Specification § 01 90 00, subsection 1.10 (subsection 1.10) and specification § 31 00 00, subsection 3.8 (subsection 3.8) expressed a general preference for recycled materials. Subsection 1.10 stated that:

> The Contractor shall salvage or recycle waste to the maximum extent practical as it relates to the capabilities of local industry. . . . Reuse of materials on the site shall be considered a form of recycling. An example of such reuse would be the use of acceptable excavated materials as fill.

Likewise, subsection 3.8 stated that Boland should "[u]se satisfactory material removed from excavations, insofar as practicable, in the construction of fills. . . . Do not waste any satisfactory excavated material without specific written authorization." Subsections 1.10 and 3.8 did not mention box culvert backfill specifically, or require Boland to use native materials for box culvert backfill in particular. (Gov't supp. R4, tab A-2 at 459, 1,628)

---

[3] Instead, the discussion turned to the issue of installing backfill over NDB wires inside the fence line (gov't supp. R4, tab C-8 at 103-04).

4

19. Specification § 31 00 00, subsection 3.11 (subsection 3.11) – which listed special requirements for excavation and backfill relating to some utilities – did not mention box culvert backfill, or require Boland to use native materials for box culvert backfill in particular (gov't supp. R4, tab A-2 at 1,630-31).

20. Drawing SI-512, on the other hand, specifically addressed box culvert backfill, stating that box culvert backfill should be "STRUCTURAL BACK FILL OR CLSM" (gov't supp. R4, tab A-2 at 3,516).[4]

21. The 0009 Contract incorporated FAR § 52.236-21(a), which stated that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern." (Gov't supp. R4, tab A-2 at 160)

22. When Boland suggested using native backfill for the box culvert, the government directed it to use structural backfill (gov't supp. R4, tab D-4 at 3,397).

23. Boland claims that the government's direction for Kingston to use structural backfill – instead of the native materials purportedly required by the 0009 Contract – increased Kingston's costs by $292,455 (compl. ¶¶ 32-35, 43).

V.    Procedural History

24. On July 31, 2018, Boland submitted certified pass-through claims on behalf of Kingston (R-4, tab B-6).

25. On October 1, 2018, the contracting officer issued final decisions denying the claims (R4, tab A-1 at 6-25). These were timely appealed to the Board.

DECISION

A contractor bears the burden of establishing a differing site condition or constructive change claim. *CDM Constructors, Inc.*, ASBCA No. 60454, 18-1 BCA ¶ 37,190 at 181,011. As discussed in greater detail below, Boland has failed to meet its burden of showing that: (1) the Line being concrete-encased constituted a differing site condition; (2) the government constructively changed the 0009 Contract by directing Boland to construct the Pole more than 1,000 feet from the NDB; or (3) that

_____

[4] Structural backfill is "crusher run waste, basalt, coral or sand. . . . [that is] free of organic matter and other deleterious substances" (gov't supp. R4, tab A-2 at 2,784). CLSM is Controlled Low Strength Material (*id.* at 3,553 drawing EI-501).

the government constructively changed the 0009 Contract by directing Boland to use structural backfill for the box culvert.

## I.       ASBCA No. 61923 (Telecommunications Line)

Boland has not established a Type I or a Type II differing site condition claim regarding the Line.

### A.       Type I Differing Site Condition Claim

Boland has not established a Type I differing site condition claim regarding the Line.  In order to establish a Type I differing site condition claim, a contractor must prove that:  (1) the contract contained a positive indication of the conditions at the site; (2) the contractor reasonably interpreted and relied upon the indicated site conditions; (3) the conditions encountered were materially different from those indicated; (4) the conditions encountered were reasonably unforeseeable based upon all the information available at the time of bidding; and (5) the contractor's injury was caused solely by the differing site condition. *Nova Group, Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,321 (citing *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998); *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987)).  Because the first factor requires a positive indication, "[a] contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *Comtrol Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002).  In determining whether a contract indicates that a condition exists, the "language of a contract must be given the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *CDM*, 18-1 BCA ¶ 37,190 at 181,012 (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)).  Thus:

> We must seek to put ourselves in the position of appellant at the time he bid on the contract, *i.e.*, we must seek the meaning that would be attached to the language by a reasonably intelligent bidder in the position of appellant, who would be expected to have the technical and trade knowledge of his industry and to know how to read and interpret technical engineering specifications and perform construction work in accordance with such specifications.

*Id*. (quoting *Adrian L. Roberson, d/b/a Roberson Construction Co.*, ASBCA No. 6248, 61-1 BCA ¶ 2,857 at 14,915).

Here, Boland does not – and cannot – point to any *positive* indication in the 0009 Contract that the Line would be exposed, or free of concrete-encasement

6

(app. br. at 11; finding 7). Instead, Boland relies upon the purported absence, or lack, of an indication that the Line was concrete-encased (app. br. at 11; compl. ¶ 9). However, without a positive indication of what the condition would be (*i.e.*, that the Line would be concrete-encased), Boland's Type I differing site condition claim must fail. *See Comtrol*, 294 F.3d at 1363.

In any event, Boland's assertion that the 0009 Contract lacked an indication that the Line was concrete-encased is incorrect. A reasonable contractor would understand that the 0009 Contract documents showed that the Line was concrete-encased – instead of exposed – because drawing EI-113 showed that the Line was a "DUCTLINE," which ¶ 3.6.3 indicated shall be concrete-encased (finding 9). Boland argues that ¶ 3.6.3 merely required that new ductlines be concrete-encased (app. reply at 9-10). However, in determining what the drawings meant by the term "DUCTLINE," a reasonable contractor would look to how that term is used elsewhere in the 0009 Contract, particularly in light of the fact that a contract must be read as a whole. *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (Fed. Cir. 2005). Moreover, Boland's argument ignores the fact that the drawings distinguished between ductlines and exposed wiring for existing lines, and identified the Line as falling into the former category (finding 9). Further, even if Boland's argument had merit, a reasonable contractor still would understand that the 0009 Contract documents showed that the Line was concrete-encased for the independent reason that drawing EI-113 identified the Line as "D1," which the drawings showed was a concrete-encased line (finding 9).

Boland also argues that it was not reasonably foreseeable that the Line was concrete-encased because some other telecommunications lines purportedly turned out to be exposed (app. br. at 13). However, the fact that other lines turned out to be exposed fails to establish that it was reasonable to conclude that the Line also was exposed because Boland has not shown that the information about the other lines was available at the time of bidding. *See Nova*, 10-2 BCA ¶ 34,533 at 170,321. In any event, even if Boland had shown that it knew at the time of bidding that the other lines were exposed, Boland still would have failed to establish that it was reasonable to rely upon that knowledge to conclude that the Line also was exposed because Boland has failed to show that the other lines were similar to the Line. In particular, Boland has failed to show that, as with the Line, the drawings indicated that the other lines were ductlines that contained a D1 call-out. (Finding 9; *see also* app. br. at 13) Because Boland has failed to show that it was reasonably foreseeable – let alone that the 0009 Contract contained a positive indication – that the Line was exposed, it has failed to establish a Type I differing site condition claim regarding the Line.

B.     Type II Differing Site Condition Claim

Nor has Boland established a Type II differing site condition claim regarding the Line. In order to establish a Type II differing site condition claim, a contractor

7

must show that the actual physical conditions encountered at the site differed from the known and usual conditions at the site, and that the different conditions caused an increase in the cost of contract performance. *Nova*, 10-2 BCA ¶ 34,533 at 170,329 (citing *Charles T. Parker Constr. Co. v. United States*, 433 F.2d 771, 778 (Ct. Cl. 1970); *Costello Indus., Inc.*, ASBCA No. 49125, 00-2 BCA ¶ 31,098 at 153,585). Here, Boland has not shown that it was unusual for telecommunications lines to be concrete-encased (app. br. at 12-13). On the contrary, the evidence shows that a reasonable contractor would not assume that buried lines in particular would be exposed (finding 8). Moreover, as discussed above, Boland knew, or should have known, from the 0009 Contract documents that the Line would be concrete-encased (finding 9). Therefore, Boland's Type II differing site condition claim also fails.

II.     ASBCA No. 61924 (Temporary Power Pole)

Boland also has failed to show that there was a constructive change regarding where it could construct the Pole. In order to establish that there was a constructive change, a contractor must show that: (1) an official directed it to perform work not required under the terms of the contract; (2) the official directing the change had contractual authority to alter the contractor's duties unilaterally; (3) the official enlarged the contractor's performance requirements; and (4) the added work was not volunteered, but resulted from the official's direction. *CDM*, 18-1 BCA ¶ 37,190 at 181,011-12. To satisfy the direction requirement, a contractor must show that the authorized government representative required or compelled the contractor to perform the work, and that government personnel did not merely offer advice, comments during discussions, suggestions, or opinion. *See McElroy Mch. & Mfg. Co.*, ASBCA No. 46477, 99-1 BCA ¶ 30,185 at 149,358; *Quality Plus Equip., Inc.*, ASBCA No. 46932, 96-2 BCA ¶ 28,595 at 142,759; *Labarge, Inc.*, ASBCA 19845, 78-2 BCA ¶ 13,376.

Here, while Boland has shown that the drawings permitted it to construct the 25 foot Pole up to 200 feet from the NDB (finding 12), Boland has failed to demonstrate that the government directed it to construct the Pole more than 1,000 feet from the NDB (app. br. at 14-15). On the contrary, the evidence shows that the project engineer reaffirmed that the drawings permitted Boland to construct a 25 foot pole up to 200 feet from the NDB (finding 14). He merely commented during discussions that he would have to compare that requirement to the airfield operations' statement that the Pole should not be constructed within 1,000 feet of the NDB, without making any follow-up statement regarding the Pole (finding 14). Because the project engineer's only comment about constructing the Pole within 1,000 feet of the NDB is inconclusive, and does not require or compel Boland to take any action, it does not constitute direction. *See McElroy*, 99-1 BCA ¶ 30,185 at 149,358; *Quality Plus*, 96-2 BCA ¶ 28,595 at 142,759; *Labarge*, 78-2 BCA ¶ 13,376. Indeed, the contemporaneous evidence demonstrates that Boland did not understand the project engineer's statement to prohibit it from constructing the Pole within 1,000 feet of the NDB because Boland

8

actually constructed the Pole within 1,000 feet of the NDB (finding 15). Absent proof of government direction, Boland's constructive change claim regarding the Pole fails.

III.     ASBCA No. 61925 (Box Culvert Backfill)

Boland has not shown that there was a constructive change regarding the box culvert backfill. As discussed above, in order to establish that there was a constructive change, a contractor must show, *inter alia*, that an official directed it to perform work not required under the terms of the contract. *CDM*, 18-1 BCA ¶ 37,190 at 181,011-12. Here, Boland has failed to show that the directed work of using structural backfill for the box culvert was not required under the terms of the 0009 Contract because drawing SI-512 required Boland to use "STRUCTURAL BACK FILL OR CLSM" for the box culvert (finding 20). Indeed, Boland does not dispute that drawing SI-512 required that Boland use structural backfill for the box culvert. Instead, Boland argues that drawing SI-512 conflicted with the specifications subsections 1.4.11, 1.10, 3.8, and 3.11, and that the specifications therefore control under FAR § 52.236-21(a) – the order of precedence clause. (App. br. at 15-20; *see also* finding 21)

"[W]hen the requirements of the specifications of a government contract conflict with the drawings and the contract contains an order of precedence clause, the specifications shall control as the order of precedence clause provides." *Hensel Phelps Constr. Co. v. United States*, 886 F.2d 1296, 1298 (Fed. Cir. 1989) (citing *Franchi Constr. Co. v. United States*, 609 F.2d at 989-90; *William F. Klingensmith, Inc. v. United States*, 505 F.2d 1257, 1261 (Ct.Cl.1974)). However, the specifications only control if there is an actual conflict or inconsistency between the specifications and the drawings. *CDM*, 18-1 BCA ¶ 37,190 at 181,016. The specifications and drawings must be read as a whole to give meaning to all their parts. *A.R. Mack Constr. Co.*, ASBCA No. 49526, 97-1 BCA ¶ 28,742 at 143,464. If possible, we avoid leaving a portion of the contractual documents useless, inexplicable, void, insignificant, meaningless or superfluous. *Id.* In particular, "a specification providing latitude or options . . . does not conflict with or contradict drawings which narrow the latitude or options provided." *Id.* at 143,465. Moreover, the "more specific requirements of the drawings [may] complement the specification by providing particularization." *Id.* at 143,464. Further, under the express terms of FAR § 52.236-21(a), anything "shown on the drawings and not mentioned in the specifications, shall be of like effect as if . . . mentioned in both."

In this case, there is no conflict between the drawings and the specifications. First, under *A.R. Mack*, 97-1 BCA ¶ 28,742, drawing SI-512 does not conflict with subsection 1.4.11 because subsection 1.4.11 at most gave Boland the discretion as to the type of backfill to use, and drawing SI-512 only narrowed that discretion by requiring Boland to use structural backfill for the box culvert (findings 17, 20). Second, under *A.R. Mack*, 97-1 BCA ¶ 28,742, drawing SI-512 does not conflict with

subsections 1.10 and 3.8 because drawing SI-512 merely provided particularization to those specifications' general preference for using recycled materials by imposing more specific requirements for box culvert backfill in particular (findings 18, 20). Indeed, by qualifying the general preference for recycled materials with the clauses "to the maximum extent practical" and "insofar as practicable," subsections 1.10 and 3.8 recognized that there would be specific instances where Boland would not be able to implement that general preference (finding 18). Third, the fact that subsection 3.11 did not list any special requirements regarding the box culvert backfill does not create a conflict with drawing SI-512 because, since drawing SI-512 showed structural backfill being used for the box culvert and subsection 3.11 did not mention box culvert backfill, it is as if both the drawing and the specification showed structural backfill being used for the box culvert under FAR 52.236-21(a) (findings 19-21).

In sum, because the specifications did not require Boland to use native materials for the box culvert backfill in particular (findings 17-19), there is no conflict between the specifications and the drawings. As a result, the drawings' requirement that Boland use structural backfill for the box culvert controls, and the government did not constructively change the 0009 Contract when it directed Boland to use structural backfill for the box culvert.

CONCLUSION

We conclude that Boland has failed to meet its burden of proving that there was a differing site condition or constructive change. Therefore, we deny these appeals.

Dated: March 19, 2021

James R. Sweet
JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

10

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61923, 61924, 61925, Appeals of David Boland, Inc., rendered in conformance with the Board's Charter.

Dated: March 19, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

11