ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| CKY, Inc. | ) | ASBCA No. 60451 |
| | ) | |
| Under Contract No. W912P8-11-D-0007 | ) | |

APPEARANCE FOR THE APPELLANT:     Daniel L. Baxter, Esq.
                                                                        Wilke, Fleury, Hoffelt, Gould & Birney, LLP
                                                                        Sacramento, CA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                                        Engineer Chief Trial Attorney
                                                                        William G. Meiners, Esq.
                                                                        J. Emmanuel I. Santa Teresa, Esq.
                                                                        Stephan C. Roth, Esq.
                                                                        Engineer Trial Attorneys
                                                                        U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE WILSON

CKY, Inc. (CKY or appellant) appeals the U.S. Army Corps of Engineers' (government or Corps) decision denying its claims for two water-related impacts to its construction site near Southern University in Baton Rouge, LA. The first involves the Mississippi River backflowing into CKY's construction site due to work being performed outside the low river level time period in contravention of a note on a hydrograph in the task order. CKY contends that this resulted in higher water levels which flooded the site, washed away work materials, and deposited debris on the site. The second involves the discovery of two undocumented drainage culverts which drained water from the surrounding areas into the site during and after rain events and allegedly required additional dewatering and slope repair work. CKY asserts both issues entitle it to compensation beyond the no-cost time extensions it has received to date, and the Corps of Engineers contends CKY has already been compensated through modifications incorporating two change orders. Only entitlement is before the Board. For the reasons discussed below, we sustain this appeal in part and deny it in part.

FINDINGS OF FACT

1. On July 22, 2010, the Corps issued Contract No. W912P8-11-D-0007 to multiple contractors, including CKY. This was a multiple award task order contract for civil works construction projects in the Greater New Orleans area and southern Louisiana. (R4, tab 7) This contract included both Federal Acquisition Regulation

(FAR) 52.233-1, DISPUTES (JUL 2002) and FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (*id*. at CKY GOV 00250, 00253). The latter provides, in pertinent part, "The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract" (*id*. at 00253).

2. On September 29, 2012, the government opened bidding for Task Order W912P8-11-D-0007-0002 (TO) for "reinforced concrete culvert installation" alongside "placement of earthen fill, bedding, geotextile . . . dewatering . . . and other incidental work" (R4, tab 7a at CKY GOV 00513-14). Bidding for this TO closed on October 9, 2012. TO Box 13 required bids to be available for government acceptance for at least 30 calendar days. (*Id*. at CKY GOV 00514)

3. Box 12 required the awardee to submit performance and payment bonds within three days of receiving the notice of award (*id*.). TO Section 00010 Note 3 stated, the government would issue the notice to proceed "immediately" once the awardee's performance and payment bonds were approved (*id*. at 00531). Box 11 required the awardee to begin performance 10 calendar days after receiving the notice to proceed, and complete performance within 210 days of receipt. Compliance with this performance period was marked "mandatory." (*Id*. at 00514)

4. TO Section 00700 Clause 3(b) required the awardee to "(1) [c]heck all drawings furnished [by the government] immediately upon receipt. . . . (3) [p]romptly notify the Contracting Officer of any discrepancies; (4) [b]e responsible for any errors that might have been avoided by complying with this paragraph (b)." Clause 3(e) states "[t]he work shall conform to the specifications and the contract drawings identified on the following index of drawings" with Drawing Nos. PC-104 and PC-614 listed in the index, among others. Clause 4 states "[t]he Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor." (*Id*. at 00533-35)

5. Drawing No. PC-104 is an existing site plan and identifies features of the work area, including a single existing culvert (app. supp. R4, tab 177 at 5). Drawing No. PC-614 is a hydrograph identifying monthly gauge readings of the Mississippi River in feet. The hydrograph begins at January 2001 and extends through early April 2012. Drawing No. PC-614 contains a Note (Note 1) stating the following: "CONSTRUCTION SHALL ONLY BE PERFORMED FROM AUGUST TO NOVEMBER WHEN MISSISSIPPI RIVER LEVELS ARE LOWEST." (App. supp. R4, tab 33 at CKY GOV 002174) During the hearing, the administrative contracting officer testified that he became aware of Note 1 in October 2014 (tr. 3/147-48). The contracting officer's representative testified he learned of Note 1 during his deposition in preparation for the hearing in this appeal (tr. 3/20-21, 29).

2

6. TO Section 31 23 19.00 12 paragraph 1.7 required the awardee to submit the following:

> [c]omplete dewatering design package with details of the proposed dewatering facilities to the Contracting Officer for review and approval by the Contracting Officer. . . . [A]pproval of the plan for installation, either as submitted or revised as a result of the review, should not be interpreted as the Government accepting responsibility for the performance of the dewatering system and shall not relieve the Contractor of full responsibility for the proper design, installation, maintenance, operation, and actual performance of both the individual system components and the entire system. . . . If, during the progress of the work, the installed dewatering system proves inadequate to meet the requirements specified, the Contractor shall, at its expense, furnish, install, and operate such additional dewatering facilities . . . as may be necessary to perform the required dewatering without additional cost to the Government.

(R4, tab 7a at CKY GOV 00911-12) Paragraph 1.8 states the awardee's plan must "accomplish the following: (1) Collect and dispose of all surface water in the protected area regardless of source" (*id*. at 00912).

7. The government amended the solicitation on October 5, 2012, to answer two requests for information ("RFIs") received during bidding. These requests concerned whether the head wall would remain in place and whether the new box culvert, the subject of the TO, could be pre-cast or cast in place. (R4, tab 7a at CKY GOV 00517-18) The record does not contain any evidence of inquiries about the dewatering requirements in light of the impending contract schedule.

8. As part of its evaluation, the government prepared an independent cost estimate and identified the cost for dewatering at $39,802.87 for the duration of the project, based on the TO documents (app. supp. R4, tab 134 at CKY GOV 004481; tr. 2/35-41). This estimate also assumed construction time of 120 days (app. supp. R4, tab 134 at CKY GOV 004477-78). In its bid, appellant projected dewatering costs at $42,652.00, with a total bid of $932,349.00 (R4, tab 19).

9. The government awarded appellant the TO on October 17, 2012 (R4, tab 7a at CKY GOV 00513). The government issued the notice to proceed on November 5, 2012, though appellant indicates that it received the letter four days later (R4, tab 9). Appellant submitted a construction schedule dated November 30, 2012, which

3

identified a work schedule starting November 5, 2012, and ending May 28, 2013 (R4, tab 35 at CKY 00145-46).

10. Appellant was prevented from mobilizing to the site until January 24, 2013 due to heavy rainfall, over two months behind schedule (R4, tab 14 at CKY GOV 00967-990, tab 35 at CKY 00145). Appellant and government personnel agreed to suspend work when the level of the nearby Mississippi River reached 23 feet or above. At that height, the river would backflow into the construction site. (App. supp. R4, tabs 40, 56; tr. 1/62-63) The government extended the TO completion date through three no-cost modifications to compensate for lost worktime due to "unusually high water" from the Mississippi River and "severe weather" (R4, tabs 21, 27-28).

11. Appellant sent two RFIs to the government for two culverts it discovered while cleaning and grubbing the site, both dated and received by the government March 1, 2013 (R4, tab 17; *see also* R4, tabs 78-81, 83-86; app. supp. R4, tab 173. Pictures of the area where the northern culvert was found do not show a culvert at all, but merely a slope with foliage and rocks obscuring it, with pooled water in the foreground (*id*. at 174 at CKY 00242). Testimony from both appellant's and government's personnel established these culverts were hidden from view during a normal site visit (tr. 1/99, 103-04, 3/88-91). In a Quality Assurance Report (QAR) dated March 15, 2013, a government construction inspector noted:

> [T]here's a 36" culvert that drains into the work area. The pipe drains the area from Southern University on top the hill in incorporates [sic] a big area during rain events a huge volume of water comes through this 36" CMP [corrugated metal pipe] which more than likely cause issues with the work being done there.[1]

(R4, tab 15 at CKY GOV 01710) (syntax in original) *See also* tr. 1/87-94) (estimating the drainage area involved). A QAR dated March 18, 2013 completed by the same inspector acknowledged a meeting between government and appellant personnel "discussing issues found on jobsite not shown on plans which could impact the job. It was decided by USACE to suspend work until these issues could be resolved." (R4, tab 15 at 01714) A QAR from the following day noted:

> [t]wo culverts, one on the north slope and one on the south slope, were uncovered during excavation. These drainages are not shown on the drawings given to the contractor and

---

[1] The QARs covered most work days. The record does not appear to account for the two week discrepancy between the RFIs and the construction inspector's acknowledgement of the culverts.

4

> will have an impact on the work to be performed due to the
> volume of runoff that can be produced with very little
> rain[.]

(*Id.* at 01716)  Appellant held a meeting with the government to discuss the two culverts on March 15, 2013, and the government "requested that CKY draft a fix for the problem and figure estimated costs" (R4, tab 6 at CKY GOV 00079).  In the meantime, appellant engaged in dewatering measures and other mitigation to manage the water from the culverts (tr. 1/112-15).

12.  Appellant's dewatering plan, submitted April 23, 2013, states "[t]he objective of this plan is to provide the [government] with an outline of the means and methods [appellant] intends to employ in accomplishing the dewatering and unwatering work described in the project plans and specifications" (R4, tab 16 at CKY GOV 02112, 02115).  Section 2.7 of this plan reads as follows:

> 2.7 UNFORESEEN WATER WITHIN THE
> CONSTRUCTION LIMITS
>
> If water is directed or enters into the construction site from
> unknown sources, CKY Inc. will investigate the source and
> notify the COR [contracting officer's representative], in the
> event the water cannot be controlled.  CKY Inc. will take all
> practical measures to limit damage to the construction site
> and will work with the COR to rectify the problem.

(*Id.* at 02117)  The government approved appellant's revised dewatering plan, dated August 7, 2013, which included minor revisions from the April plan not relevant here (R4, tab 50; tr. 3/135-39).

13.  By letter dated July 1, 2013, the government issued a Request for Proposal (RFP) to appellant to "[p]rovide additional drainage pipes and swales to direct the flow from three existing drainage outlets into the new proposed culvert and headwall," included a new Section 33 44 00 – Storm Drainage Utilities, and provided four new drawings to replace previous drawings in the TO (app. supp. R4, tab 41 at CKY GOV 002225).  The letter requested a "complete itemized breakdown . . . .  It should cover all work involved in the modification . . . and the effects of the changes on unchanged work (impact) if any."  (*Id.* at 002224)

14.  Appellant submitted its proposal for the changes by letter dated July 25, 2013.  This proposal included an "itemized breakdown for all materials, labor and equipment to make changes to the box culvert's headwall installation and add a new RCP inlet per the attached drawings."  (App. supp. R4, tabs 60-61)  This proposal was

accepted, and the government issued a notice to proceed with the change by two letters dated May 7, 2014 (app. supp. R4, tabs 42-43).

15. The government and appellant continued to negotiate over the price of the additional work until September 5, 2014. The price negotiation memorandum prepared by the government discussed negotiations with the contractor for "a fair and reasonable settlement for the work of the change," with the parties reaching an agreed amount of $240,000. (App. supp. R4, tab 57 at CKY GOV 002340) "The government and the contractor agreed that the final negotiated settlement as shown below was fair, reasonable, and an equitable adjustment to the contract for all work associated with this change will [sic] be forthcoming, including all applicable costs for overhead and impact" (*id.* at 002341). This memorandum was signed December 17, 2014 (*id.*). Testimony during the hearing indicated this discussion was only related to the work which resulted from the RFP (tr. 1/146, 3/124, 129-34).

16. During these negotiations, the government issued two unilateral modifications, numbered 1E and 1L, which added a combined total of $150,000 to CIN-003 (R4, tab 25). Both of these modifications acknowledge in their closing statements that this is "a partial payment" and is "issued on a unilateral basis as agreement has not been reached on the cost of the work" discussed by the July 2013 RFP (*id*. at CKY GOV 02150, 02152).

17. The final modification related to this RFP was Modification No. 1M (Mod 1M), signed by both parties on December 11 and 12, 2014. This added another $90,000 to CIN-003 and contained the following closing statement:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor, its subcontractors and suppliers for all costs and markups directly or indirectly attributable to the changes ordered, for all delays, impacts and extended overhead related thereto, and for performance of the change within the time frame stated.

(R4, tab 30 at CKY GOV 02164-66)

18. On June 17, 2015, appellant submitted a claim to the contracting officer for $1,146,226.00 incurred as a result of what appellant alleges is out of scope work dealing with the Mississippi River's backflow and the undocumented culverts' discharge into the work site. Appellant's claim stated it constructed and maintained a downstream coffer dam in order to manage the river's backflow, excavated debris which had washed into the site, and replaced material which had washed out. For this work, appellant claims it has to date only received no-cost extensions from the

government, and it says it was told to submit a claim to the government for any additional payment. (R4, tab 4 at CKY GOV 00056-58) Appellant's claim also stated the discharge from the undocumented culverts after heavy rain events "routinely scoured the slopes and washed materials from the slopes into CKY's excavation area, which needed to be excavated and replaced on the slopes; at times, the water also carried away some of the material previously placed by CKY, thus requiring additional work" beyond the TO's requirements. (R4, tab 4 at CKY GOV 00058) Appellant did not identify how much of the total claimed amount was attributable to impacts from the high river level and how much to the undocumented culverts, nor to a third claim which it has since abandoned (*compare* R4, tab 4 *with* compl.). On December 11, 2015, the contracting officer issued a final decision denying appellant's claim in its entirety (R4, tab 3 at CKY GOV 00052). This decision relied in part on the construction manager's advice, who understood the TO's timeline as established in Note 1 of the hydrograph (tr. 1/193-94). Appellant timely appealed on February 19, 2016, claiming only $710,807.00, which was docketed as ASBCA No. 60451.

## DISCUSSION

### I. High River Level Impact Claim

Appellant's first claim involves work performed to mitigate damage caused by floodwaters backflowing into its work site from the nearby Mississippi River. Appellant claims that this work, which included constructing and maintaining a coffer dam, replacing lost materials, and removing debris, was beyond the scope of the TO, as it would have been unnecessary had the government held to the August to November time frame in Note 1, rather than issuing the notice to proceed in early November. (Findings 9, 18) Appellant advances three theories in support of its claims: that the government provided defective specifications by including a separate timeframe in Note 1, that appellant encountered a Type 1 differing site condition in the water levels than what it anticipated by relying on Note 1, and that there was a mutual mistake between the parties regarding the condition of the site.

The government argues that delays related to this claim were not shown to affect the critical path, and that contractors may not be compensated for unusually severe, unpredictable weather. The government further argues the notice to proceed was issued in strict accordance with the terms of the TO, and that any defect in the performance period was patent, imposing upon appellant a duty to inquire, which it failed to do. Finally, the government argues that appellant elected to work outside the timeframe in Note 1.

7

## A. Defective Specifications

There is "an implied warranty by the government that, when the contract contains design specifications, satisfactory contract performance will result if the contractor follows those specifications." *AAB Joint Venture v. United States*, 75 Fed. Cl. 414, 428 (2007). For a contractor to recover due to defective specifications, it "must show that it was misled by the defect. To demonstrate that it was misled, the contractor-claimant must show both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance . . . ." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004). "The government's implied warranty of its design specifications and drawings does not relieve a contractor of its duty to inquire about a patent ambiguity, inconsistency or mistake when it recognized or should have recognized an error in the specifications or drawings." *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,124. As stated further:

> Because the doctrine has the effect of relieving the government of the consequences of its own poorly drafted contract, it is applied narrowly to those cases where the ambiguity is so patent and glaring that it is unreasonable for a contractor not to inquire about them. More subtle ambiguities are deemed latent and accorded an interpretation favorable to the contractor.

*R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007 at 180,236. "The existence of a patent ambiguity in a government contract 'raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation. . . . Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor." *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997) (quoting *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985)). "Whether an ambiguity is patent or latent is a question of law. . . . This determination is made on a case-by-case basis." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) (citations omitted).

Appellant relies on Note 1 on Drawing No. PC-614, which states work time should be restricted to between August and November (finding 5). The TO states "[t]he work shall conform to the specifications and the contract drawings identified on the following index of drawings," referring to an index which includes Drawing No. PC-614 (finding 4). However, there were other inconsistent indications in the TO of when the period of performance was meant to take place. The TO was open for bids until October 9, 2012, and required bids to be available for government acceptance for 30 days (finding 2). This indicates the government intended to accept them within that time. Boxes 12a and 12b of the TO mandate that the contractor submit performance and payment bonds within three

calendar days of award (finding 3). After the government's verification of those bonds, the TO stated, the government would issue the Notice to Proceed "immediately" afterwards. Box 11 allows the contractor 210 days from the Notice to Proceed to complete performance, and the performance period is marked as mandatory. (*Id.*) This presents an entirely different timeline than that specified in Note 1, and begins predictably some time in November or December 2012. We conclude that Note 1 presented an inconsistency with these other parts of the TO sufficient to create a patent ambiguity, and triggered appellant's duty to inquire prior to the closing of the solicitation.[2] There is no evidence in the record of appellant's inquiring about this inconsistency (*see, e.g.,* finding 7).

Buttressing this finding, the TO required the contractor to "[c]heck all drawings furnished . . . immediately upon receipt," and "[p]romptly notify the Contracting Officer of any discrepancies." It then made the contractor "responsible for any errors that might have been avoided by complying" with these requirements," stating "[t]he government shall not be responsible for any interpretation of or conclusion drawn from the data or information [drawings and specifications] by the Contractor." (Finding 4) The contractor had a duty to inquire about the patent ambiguity, and having failed to do so, is barred from recovering based on its interpretation of the period of performance.

### B. *Differing Site Condition*

The presence of the patent ambiguity in the performance period defeats this theory for recovery related to the high river level impact claim. The underlying contract contained the clause FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (finding 1). To establish a Type 1 differing site condition,

> a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a

---

[2] This ambiguity appears to have confused government personnel as well. The cost engineer created his government estimate based on a 120 day schedule which reflected the August-November timeline, and the construction manager evaluated appellant's claim assuming Note 1 controlled the timeline (findings 8, 18). However, the administrative contracting officer became aware of Note 1 two years after bidding closed, and the contracting officer's representative learned of it almost four years after that (findings 2, 5).

result of the material variation between expected and encountered conditions.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)). Recovery is barred when there is a patent ambiguity in the contract related to the differing site condition, because this ambiguity should put appellant on notice that the encountered condition may be present. *Comtrol*, 294 F.3d at 1365.

Appellant complains it encountered differing site conditions than those it would have encountered if the TO work were performed within the period of time discussed by Note 1. This argument suffers from at least two defects. First, Note 1 is not a site condition, but a restriction as to the period of performance, i.e. a term of the TO. Second, as the river level indicated by the hydrograph is the site condition, the projected river level was laid out in Drawing No. PC-614 for January 2001 through April 2012 (finding 5). Appellant cannot claim the conditions of the water level during any time of year would be reasonably unforeseeable based on all the information it had available at the time of bidding. The hydrograph estimated the river's annual level and, as stated above, the timing of the TO's work performance was unclear. To the extent appellant claims compensation due to unusually heavy rains, we view extreme weather as an Act of God and not compensable under the Differing Site Condition clause absent a governmental act or fault. *Tidewater, Inc.*, ASBCA No. 61076, 18-1 BCA ¶ 37,195 at 181,076-77. Despite appellant's arguments to the contrary, we also do not believe the government committed a qualifying act or fault within the meaning of this doctrine. The government's enforcement of the period of performance beginning in November cannot be such an act or fault, as it enforces one of the possible reasonable interpretations of the TO's period of performance.

### C. Mutual Mistake

The patent ambiguity related to the TO's period of performance identified above defeats the mutual mistake claim as well. A claim for mutual mistake requires the appellant to prove 1) the parties to the contract were mistaken in their belief regarding a fact, 2) the mistaken belief was a basic assumption underlying the contract, 3) this mistake had a material effect on the bargain, and 4) the contract did not put the risk of the mistake on the party seeking reformation. *SKE Base Servs. GmbH*, ASBCA No. 60101, 18-1 BCA ¶ 37,159 at 180,902 (citing *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329-30 (Fed. Cir. 2006)). However, "a party cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where . . . the 'mistake' is a result of that party's failure to exercise due diligence." *CanPro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 342 (2017) (quoting *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 175 (2014)) (omission in original). Thus, "even if [appellant]

had provided a basis for reformation, the patent ambiguity doctrine would preclude recovery." *C.W. Over & Sons, Inc. v. United States*, 54 Fed. Cl. 514, 528 (2002).

Here, the presence of the performance period's patent ambiguity bars recovery under a theory of mutual mistake. Appellant's failure to inquire is a failure to exercise due diligence. As part of its argument, appellant points to its bid containing a similar dewatering cost as the government developed in the project cost estimate (app. br. at 38; finding 8). However, this suggests the parties may have had similar beliefs about the costs associated with the project, but does not excuse appellant's failure to inquire.

In light of the foregoing, we conclude that appellant's failure to inquire about Note 1 in the face of contractual language establishing an incompatible period of performance prevents recovery of costs associated with the impact of the high river level under all three theories.

## II. *Undocumented Culverts Claim*

Appellant's second claim concerns mitigation work related to two culverts it discovered in the construction site during the course of performance. Discharge from these culverts after heavy rain events allegedly resulted in damage to slopes, debris washing into the work site, and appellant having to replace lost material that was displaced by the water. Appellant asserts discharge from these culverts also caused the site to become too wet and unmanageable for it to continue work on some days, and it was required to perform mitigation measures prior to execution of the change orders. (Findings 11, 18) Though the government asserts in its briefing that Mods 1E, 1L, and 1M compensated appellant for all the extra work related to these culverts, appellant claims this compensation related only to work developed as a result of the July 2013 RFP. Appellant asserts these modifications did not include work appellant performed to mitigate damage to the site caused by the culverts prior to the government and appellant executing the two change orders.

Appellant relies on the same three legal theories for its second claim. Appellant argues primarily that it has established a Type 1 differing site condition for these culverts. In the alternative, it further argues the government provided defective specifications, as evidenced by the failure of the drawings to disclose the culverts, and finally it argues it and the government were mutually mistaken as to the site conditions.

The government argues that appellant was compensated for these delays through Mod 1M, which precludes further recovery by appellant  The government further argues the TO charged appellant with managing all water found on the site. Further, appellant's dewatering plan was created a month after discovery of the culverts, and thus appellant's planned dewatering must have accounted for the extra water, making

11

the discharges within the scope of the TO. We find appellant has shown a Type 1 differing site condition and that the government's arguments are without merit.

"It is well settled that contractors are charged only with the knowledge of any defects that a reasonable site investigation would have revealed." *Dan G. Trawick, III Contractors*, ASBCA No. 47779, 98-2 BCA ¶ 29,781 at 147,571. Appellant has established materially different conditions from those indicated by the TO, and that these conditions were reasonably unforeseeable. The TO's drawings indicated a single culvert which would drain water into the work site during and after rain events, though there were ultimately three culverts present. These extra two were hidden from view on a normal site visit. Indeed, pictures of the northern culvert do not show a culvert at all, but merely a slope with foliage and rocks obscuring it, with pooled water in the foreground. (Finding 11)

Appellant has also shown it relied on the TO's documents in preparing its bid. Its bid for the dewatering efforts did not vary significantly from the government-prepared estimate for this same expense, which were based on the TO's documents (finding 8). This suggests that the bid was in line with the government's understanding of the cost and scope of the work. These documents did not include the two undiscovered culverts (finding 5). The eventual solution to this condition was incorporated into a modification to the TO, confirming that the work related to these two culverts was beyond the TO's scope of work (findings 11-15, 17).

Finally, appellant has shown that these culverts caused the damage. As only entitlement is before us, appellant need not quantify this damage, but only show that it happened. These culverts discharged a significant amount of water during and after rain events, draining a much larger area into the site than appellant anticipated (*see* finding 11). These culverts affected the project enough that the government both shut down work while it decided how to deal with them, and subsequently modified the TO and TO price to include additional work for the appellant to reduce their impact (findings 11, 13-14, 17).

The government argues that the closing statement in Mod 1M encompasses all damages appellant suffered due to these culverts (*see* gov't br. at 16, 31-32, 43; gov't reply br. at 13-16). However, the plain language of Mod 1M's closing statement does not support this argument. The closing statement says in pertinent part, "this adjustment constitutes compensation in full . . . for all costs and markups directly or indirectly *attributable to the changes ordered*, for all delays, impacts and extended overhead *related thereto*." (Finding 17) (emphasis added) The word "thereto" in this sentence cannot relate to "the undisclosed culverts," as the government claims, since this phrase does not appear in the document (gov't br. at 31; finding 17). So much as the government may be arguing "thereto" refers to "delays," this would present an ambiguity. The lack of a comma after "impacts," may mean "impacts and extended

12

overhead" are a separate list discussing aspects of the delays, with "thereto" then referring to "delays." If this is the case, the term "delays" would then be ambiguous as to which delays, whether it is delays existing prior to the modification, or delays related solely to the work encompassed in Mod 1M. However, the language in the July 2013 RFP; appellant's responsive bid; and the prior two modifications, 1E and 1L, which discuss the work to be added, and to which Mod 1M refers, indicate the subject of this closing statement was only other work resulting from the change orders, and not pre-change order work. (Findings 13-17) The price negotiation memorandum prepared for the file is also informative, as it was signed only a few days after Mod 1M, and yet makes no mention of anything but the work in the change orders. The compensation amount in this memo and Mod 1M is the same, and it also refers to work using language similar to that in Mod 1M's closing statement, illuminating the latter's meaning. (Finding 15) We believe the closing statement in Mod 1M does not include the delays and added costs attributable to the culverts prior to the execution of the change order, but only costs associated with the mitigation work added thereby. Thus, Mod 1M did not compensate appellant for delays or impacts prior to engaging in the change order work.

Additionally, the government argues that since appellant's initial dewatering plan was issued in April 2013, a month after the discovery of the culverts in March 2013, the plan "could have accounted for these two culverts" (gov't reply br. at 18). Further, TO Section 31 23 19.00 12, paragraph 1.8 charges appellant to "[c]ollect and dispose of all surface water in the protected area regardless of source" (gov't reply br. at 17; finding 6). However, we must consider the contract as a whole and interpret it so as to avoid conflicts. *Zebel, LLC v. United States*, 135 Fed. Cl. 47 (2017), *NVT Tech., Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004). Paragraph 1.8 is referring back to Paragraph 1.7's discussion of the dewatering plan to be submitted by the awardee. It is inconsistent to read paragraph 1.7 to discuss the TO awardee shaping its dewatering plan "to meet the requirements specified" in the rest of the TO, and then read paragraph 1.8 as assigning the awardee's eventual plan responsibility for all sources of water which will interact with the project site in any way during performance (finding 12). Further, the plain language of appellant's plan states it is designed to "accomplish[] the dewatering and unwatering work *described in the project plans and specifications*" (finding 12) (emphasis added). The earliest TO drawings to include the additional culverts were those included with the July 2013 RFP, two months after the initial dewatering plan (finding 13). Thus, we find appellant was pursuing a solution to the undocumented culverts under Section 2.7 of the dewatering plan, which was to request further information and direction from the government (finding 12). We find the government's argument is without merit.

In summary, we find that the presence of the patent ambiguity related to the TO's period of performance prevents any recovery for impacts by the high river level. However, we find appellant has established the presence of a Type 1 differing site condition due to the two undocumented culverts and should recover on that basis. We

have considered the other arguments advanced by both parties and, in light of the above, find them to be without merit.

CONCLUSION

For the reasons stated above, this appeal is sustained in part and denied in part, and returned to the parties to determine quantum.

Dated:  April 13, 2020

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60451, Appeal of CKY, Inc., rendered in conformance with the Board's Charter.

Dated:  April 13, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals